S. ASHLIE BERINGER, SBN 263977
ABeringer@gibsondunn.com
WESLEY SZE, SBN 306715
WSze@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, California 94301-1744
Telephone: (650) 849-5300

ABIGAIL A. BARRERA, SBN 301746
ABarrera@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8200

*Attorneys for Defendant Robinhood Markets, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMILLAH DUNN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD MARKETS, INC., a Delaware company,<br><br>Defendant. | CASE NO. 3:26-CV-04291-TLT<br><br>**DEFENDANT ROBINHOOD MARKETS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(B)(6)**<br><br>*[Request for Judicial Notice, Declaration of Marc O'Such and Exhibits A to H thereto, and Proposed Order filed concurrently]*<br><br>**Hearing:**<br>Date: December 8, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Trina L. Thompson<br>Courtroom: 9 – 19th Floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on December 8, 2026, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Trina L. Thompson, in Courtroom 9, Floor 19, of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Robinhood Markets, Inc. (Robinhood) will and hereby does move this Court, under Federal Rule of Civil Procedure 12(b)(6), for an order dismissing all of the claims in Plaintiff Jamillah Dunn's complaint with prejudice.

The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the proposed order filed concurrently herewith; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should dismiss all claims in the complaint (Counts I to VII) because all parties consented to the purported interception, and independently dismiss the claim under the Electronic Communications Privacy Act (Count I) because Robinhood so consented.

2. Whether the Court should dismiss the claims under the Electronic Communications Privacy Act (Count I) and California Invasion of Privacy Act (Count II) because Google Analytics, as Robinhood's service provider, was a party to the communications, and because Dunn has not alleged a viable theory to hold Robinhood secondarily liable or to establish a primary violation by Google.

3. Whether the Court should dismiss the negligence claim (Count III) because Plaintiff's negligence per se claim is unavailable, because Robinhood had no duty, and because the economic-loss rule bars the claim.

4. Whether the Court should dismiss the claim under the California Consumer Privacy Act (Count IV) because Plaintiff does not allege that Google gained unauthorized access to the specific types of sensitive personal information that support a private right of action under the statute.

5. Whether the Court should dismiss the intrusion-upon-seclusion claim (Count VI) because Plaintiff had no reasonable expectation of privacy and the alleged intrusion was not highly offensive.

6. Whether the Court should dismiss the breach-of-implied-contract and breach-of-confidence claims (Counts V and VII) because they are foreclosed by Plaintiff's express contracts with Robinhood.

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

BACKGROUND ..... 3

A. Dunn's factual allegations focus on basic web activity allegedly sent to Google Analytics. ..... 3

B. Dunn agreed to Robinhood policies disclosing the use of Google Analytics. ..... 6

C. Despite agreeing to the use of Google Analytics, Dunn now brings claims recharacterizing it as illegal wiretapping. ..... 7

LEGAL STANDARD ..... 8

ARGUMENT ..... 8

I. Dunn's consent to Google Analytics forecloses all of her claims. ..... 8

A. Dunn's consent defeats all claims. ..... 8

B. Robinhood's consent independently defeats the ECPA claim (Count I). ..... 11

II. Dunn independently fails to state any claim. ..... 11

A. Dunn fails to state a violation of ECPA (Count I) or CIPA (Count II). ..... 11

B. Dunn has not stated a negligence claim (Count III). ..... 20

C. Dunn has not stated a CCPA claim (Count IV). ..... 22

D. Dunn has not stated a claim of intrusion upon seclusion (Count VI). ..... 23

E. The express contracts foreclose Dunn's claims for breach of implied contract (Count V) and breach of confidence (Count VII). ..... 25

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 8

*Balabbo v. Wildflower Brands, LLC*,
2026 WL 1122773 (Cal. Super. Apr. 6, 2026) ....... 14, 19

*Baton v. Ledger SAS*,
740 F. Supp. 3d 847 (N.D. Cal. 2024) ....... 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 8, 9

*Belluomini v. Citigroup, Inc.*,
2013 WL 3855589 (N.D. Cal. July 24, 2013) ....... 24

*Berkla v. Corel Corp.*,
302 F.3d 909 (9th Cir. 2002) ....... 25

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ....... 8, 9

*Calise v. Meta Platforms, Inc.*,
810 F. Supp. 3d 1038 (N.D. Cal. 2025) ....... 21

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ....... 16

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ....... 15

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026) ....... 15

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) ....... 17

*Cork v. CC-Palo Alto, Inc.*,
534 F. Supp. 3d 1156 (N.D. Cal. 2021) ....... 16

*Crowley v. CyberSource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) ....... 16

*Das v. Bank of Am., N.A.*,
186 Cal. App. 4th 727 (2010) ....... 16

*Delgado v. Meta Platforms, Inc.*,
718 F. Supp. 3d 1146 (N.D. Cal. 2024) ....... 23

*Dellasala v. Samba TV, Inc.*,
2026 WL 1138358 (N.D. Cal. Apr. 21, 2026) ....... 18

*Dent v. Nat'l Football League*,
968 F.3d 1126 (9th Cir. 2020)....20

*Doe v. Eating Recovery Ctr. LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ....11, 12, 18, 19, 20

*Elsayed v. Maserati N. Am., Inc.*,
215 F. Supp. 3d 949 (C.D. Cal. 2016) ....21

*Esparza v. UAG Escondido A1 Inc.*,
2024 WL 559241 (S.D. Cal. Feb. 12, 2024) ....17

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ....10

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)....12, 23

*Freeman v. DirecTV, Inc.*,
457 F.3d 1001 (9th Cir. 2006)....15

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) ....12

*Gutierrez v. Converse Inc.*,
2025 WL 1895315 (9th Cir. July 9, 2025)....18

*Hammerling v. Google LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024)....23

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....24

*Heiting v. Taro Pharm. USA, Inc.*,
728 F. Supp. 3d 1112 (C.D. Cal. 2024) ....18

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ....23

*Hohenshelt v. Superior Ct.*,
18 Cal. 5th 310 (2025) ....14

*Ingraham v. Cap. One Fin. Corp.*,
2026 WL 1755170 (N.D. Cal. May 22, 2026) ....24

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....24

*J.S. v. Spring Fertility Holdings, LLC*,
2026 WL 1483490 (N.D. Cal. May 27, 2026) ....16, 17, 18

*Johnson v. Blue Nile, Inc.*,
2021 WL 1312771 (N.D. Cal. Apr. 8, 2021) ....12

*Jones v. Peloton Interactive, Inc.*,
720 F. Supp. 3d 940 (S.D. Cal. 2024)....12

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ....................11

*Kirch v. Embarq Mgmt. Co.*,
702 F.3d 1245 (10th Cir. 2012)....................15

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) ....................2, 8, 10, 11

*Licea v. Am. Eagle Outfitters, Inc.*,
659 F. Supp. 3d 1072 (C.D. Cal. 2023) ....................13

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................24

*NuCal Foods, Inc. v. Quality Egg LLC*,
918 F. Supp. 2d 1023 (E.D. Cal. 2013)....................21

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ....................9

*Papasan v. Allain*,
478 U.S. 265 (1986)....................9

*Peavy v. WFAA-TV, Inc.*,
221 F.3d 158 (5th Cir. 2000)....................15

*People v. Perez*,
35 Cal. 4th 1219 (2005) ....................17

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................21, 24

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................14

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976)....................2, 13, 14

*Rodriguez v. Ink Am. Int'l Grp. LLC*,
2025 WL 4034985 (Cal. Super. Dec. 10, 2025) ....................14, 19

*Rose v. California*,
19 Cal. 2d 713 (1942) ....................13

*Seismic Reservoir 2020, Inc. v. Paulsson*,
785 F.3d 330 (9th Cir. 2015)....................8

*Shah v. Capital One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) ....................19, 20, 21, 23, 25

*Sheen v. Wells Fargo Bank, N.A.*,
12 Cal. 5th 905 (2022) ....................21

*Shefts v. Petrakis*,
954 F. Supp. 2d 769 (C.D. Ill. 2013) ....................16

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) ....... 10

*Simi Mgmt. Corp. v. Bank of Am. Corp.*,
2012 WL 259865 (N.D. Cal. Jan. 27, 2012) ....... 16

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ....... 2, 8, 10

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) ....... 16

*Smith v. YETI Coolers, LLC*,
754 F. Supp. 3d 933 (N.D. Cal. 2024) ....... 17

*Stoba v. Saveology.com, LLC*,
2014 WL 3573404 (S.D. Cal. July 18, 2014) ....... 16

*Straight v. Edfinancial Servs., LLC*,
2026 WL 2087412 (N.D. Cal. July 20, 2026) ....... 25

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) ....... 18

*In re Toys R Us, Inc. Privacy Litig.*,
2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) ....... 15

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ....... 16

*United States v. Estate of Romani*,
523 U.S. 517 (1998) ....... 14

*United States v. Hernandez-Garcia*,
44 F.4th 1157 (9th Cir. 2022) ....... 13

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ....... 8

*Van Buren v. United States*,
593 U.S. 374 (2021) ....... 20

*Verdugo v. Target Corp.*,
59 Cal. 4th 312 (2014) ....... 21

*Williams v. DDR Media, LLC*,
757 F. Supp. 3d 989 (N.D. Cal. 2024) ....... 18

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ....... 11, 24

*Yale v. Clicktale, Inc.*,
2021 WL 1428400 (N.D. Cal. Apr. 15, 2021) ....... 12

*Yockey v. Salesforce, Inc.*,
688 F. Supp. 3d 962 (N.D. Cal. 2023) ....... 12

**Statutes**

15 U.S.C. § 6801 *et seq*....13

15 U.S.C. § 6802(b)(2)....13

18 U.S.C. § 2511(2)(d)....8, 11

18 U.S.C. § 2520....15, 16

18 U.S.C. § 2520(a)....15

Cal. Civ. Code § 1798.81.5(d)(1)....22, 23

Cal. Civ. Code § 1798.100....23

Cal. Civ. Code § 1798.100 *et seq.*....13

Cal. Civ. Code § 1798.115(d)....23

Cal. Civ. Code § 1798.140(ag)(1)....13, 23

Cal. Civ. Code § 1798.140(ai)....13

Cal. Civ. Code § 1798.140(e)(5)....12, 13, 23

Cal. Civ. Code § 1798.150....22, 23

Cal. Civ. Code § 1798.150(a)(1)....3, 8, 22

Cal. Civ. Code § 1798.155....23

Cal. Civ. Code § 1798.199.90....23

Cal. Civ. Code § 3515....8

Cal. Fin. Code § 4050 *et seq.*....13

Cal. Fin. Code § 4056(b)(9)....13

Cal. Pen. Code § 631(a)....8, 11, 16, 18, 19

Cal. Pen. Code § 632(a)....8, 11, 16, 19

Cal. Pen. Code § 632.5....19

Cal. Pen. Code § 632.6....19

**Other Authorities**

*About App Links*, Android Developers....6

Adam Volle, *Query String*. Encyclopedia Britannica (Dec. 19, 2025)....5, 6

*Allowing Apps and Websites to Link to Your Content*, Apple Developer....6

*Deep Linking*, Wikipedia.com....................................................6

*Measurement Protocol Parameter Reference*, Google Analytics....................................................5

Restatement (Second) of Torts § 652B cmt. a ....................................................24

*Understanding the Digital Analytics Program*, Digital.gov ....................................................4

## INTRODUCTION

The complaint in this case arises from Robinhood's alleged use of Google Analytics—"one of the most popular web analytics platforms on the internet"—to process basic information about the Robinhood web pages that its customers visit. Robinhood told its account holders—prominently, repeatedly, and in plain English—that "we use Google Analytics" as a service provider to help Robinhood understand how its users interact with its website and services.

Plaintiff Jamillah Dunn, like every Robinhood account holder, was required to accept Robinhood's Customer Agreement and Privacy Policy to open her account. The Privacy Policy she accepted detailed the use of Google Analytics. And what Robinhood disclosed, Congress and the California legislature have expressly authorized. The Gramm-Leach-Bliley Act (GLBA), the California Financial Information Privacy Act (CFIPA), and the California Consumer Privacy Act (CCPA) each permit Robinhood to share customer data with service providers that, like Google Analytics here, are contractually barred from using the data for anyone's benefit but Robinhood's. Dunn nonetheless asks this Court to recast this disclosed, accepted, and statutorily sanctioned use of service providers as criminal wiretapping and an "egregious" invasion of privacy.

The complaint is most notable for what it does not allege. Though the complaint opens with ominous warnings of Google "determining a specific consumer's net worth and financial health," Dunn does not allege a shred of factual support for the claim that Robinhood shared information from any user's account with Google Analytics. Instead, Dunn points to a handful of purported web captures that, on their face, show merely that Google Analytics received the web address and title of Robinhood web pages that an unidentified user visited, together with information about how the user arrived at those pages. It is well settled that such basic, non-sensitive information does not support a wiretapping or invasion-of-privacy claim. Nor does Dunn attempt to explain how such trivial data could conceivably lead to concrete harm or provide any facts to explain how Google Analytics' disclosed access to information about web pages visited could contribute to a "loss of privacy" and "diminution in the value" of information whose market value she never tried to realize.

What the complaint does contain, at length, is pages describing *other* Google products (Google Ads and Google Cloud) that Dunn never connects to Robinhood. Setting aside the conflation of Google

Analytics with other Google products, the complaint's allegations about what data was allegedly shared focus solely on Robinhood's use of Google Analytics—a practice Dunn accepted when she agreed to Robinhood's terms to create an account. The complaint's allegations do not state a claim as a matter of law, and the Court should dismiss the complaint with prejudice for several reasons.

First, consent forecloses every claim (Counts I-VII). Lack of consent is an element of, or consent is a complete defense to, each cause of action Dunn pleads, and consent may be decided on a motion to dismiss. *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1054 (N.D. Cal. 2025); *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018). Dunn agreed to a Privacy Policy that specifically disclosed that Robinhood shares data about user interactions with Robinhood's website with Google Analytics, and linked to Google's detailed policies explaining that Google Analytics would use such data only "to provide the Google Analytics services" to Robinhood—not for marketing or any other purpose. These disclosures—which Dunn accepted—are far more than what is required to establish consent. Independently, Robinhood's own consent defeats the ECPA claim (Count I) because ECPA requires the consent of only one party.

Second, Dunn pleads no wiretapping or eavesdropping (Counts I-II). As the Robinhood Privacy Policies, and the Google policies incorporated into them, make clear, Google Analytics is Robinhood's service provider—an extension of Robinhood's own website. The GLBA, CFIPA, and CCPA each specifically authorize sharing customer data with service providers, even without such consent. And the CCPA—California's recently enacted omnibus privacy law—expressly clarifies that such service providers include "analytic services." The "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a . . . statute covering a more generalized spectrum" forbids reading two general wiretapping statutes from the 1960s and 1980s to criminalize what three specific, more recent statutes expressly permit. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). Dunn also has not pleaded any viable theory of secondary liability. ECPA and CIPA § 632 do not provide for secondary liability at all. And Dunn alleges no facts suggesting Robinhood intended to aid any violation of CIPA § 631, nor even that Google committed a primary violation.

Third, the remaining claims fare no better. Negligence (Count III) founders both because Dunn

does not plead any actionable duty that is consistent with the GLBA's and CFIPA's express authorizations, and also because the economic-loss rule bars tort-based recovery for alleged harms that are purely economic. The CCPA claim (Count IV) alleges neither an "unauthorized" disclosure nor the types of sensitive personal information required to plead a private right of action. Cal. Civ. Code § 1798.150(a)(1). The intrusion claim (Count VI) fails because Dunn cannot claim a reasonable expectation of privacy in data she agreed could be disclosed, and because the routine, statutorily authorized, and fully disclosed use of website analytics to track customer website interactions (which numerous government agencies use similarly) is not an egregious breach of social norms. And Dunn's express contracts with Robinhood foreclose her implied-contract and breach-of-confidence theories (Counts V, VII).

These fundamental flaws in Dunn's claims are not fixable pleading foot-faults. No amendment can change the terms Dunn accepted, the non-sensitive information she alleges was shared, or the statutes that authorize what she challenges. This Court should dismiss the complaint with prejudice.[1]

## BACKGROUND

### A. Dunn's factual allegations focus on basic web activity allegedly sent to Google Analytics.

Dunn has been a Robinhood user for at least five years. ¶ 81.[2] Dunn also alleges that she had an account with Google and logged into Google on the same device where she logged into her Robinhood account. ¶ 82. Although the complaint defines "Google Trackers" to include three separate tools offered by Google, ¶ 30 & n.1, the allegations forming the basis of the claims concern only the transmission of certain information about the pages users viewed on the Robinhood website to Robinhood's service provider, Google Analytics. *See infra*, at 4-6.

Robinhood deploys Google Analytics—"one of the most popular web analytics platforms on the internet," ¶ 41—so that Robinhood can understand how its users interact with its website. ¶¶ 41-42. Google Analytics is used by millions of websites—retailers, newspapers, universities, and

---

[1] Robinhood expressly reserves all rights and defenses not raised herein, including any right of any Robinhood entity to compel arbitration.

[2] References to "¶ _," "¶¶ _," or "Fig. _" are to the complaint's allegations and figures, which are assumed true for purposes of this motion only. Citations to "Ex. __" refer to the exhibits attached to the concurrently filed declaration of Marc O'Such.

government agencies alike—for that same commonplace purpose: "to understand how visitors engage with their sites or apps." Ex. F at 2.[3] Data from user activity on Robinhood's website is "sen[t] . . . to Google Analytics for processing" and used "to generate reports to help analyze the data from the webpages," including reports on how users arrived at the webpages and the web pages that users visit. ¶¶ 46-47.

Dunn alleges that Robinhood transmitted to Google: "1) names and prices of securities she searched and holds in her account; 2) identifiers allowing Google to specifically identify her, and 3) her Robinhood account number." ¶ 84. Yet the complaint's factual allegations do not support these conclusory claims. Instead, Dunn's only factual allegations rest entirely on four screenshots purporting to reflect information collected by a "Google Analytics tracker" while the user was viewing a particular page on Robinhood's website. Figs. 3, 4, 6, 7. On its face, each screenshot shows only that Google Analytics received information about *the address and title of the website page the user was viewing*, as well as *how the user got to that page* (search, link, etc.). Indeed, each piece of information Dunn cites in these screenshots is accompanied by a standard label (*e.g.*, "dl", "dt", "source") describing what is contained in the accompanying field—much like the fields "To:" and "From:" on an address label describe the information that follows (*i.e.*, the recipient and sender).

Taking the labels and information in Figure 4 as an example (blue boxes added):




[3] *See, e.g.*, *Understanding the Digital Analytics Program*, Digital.gov (last accessed Aug. 24, 2026) ("Google Analytics 360 [is used] to measure traffic and engagement across thousands of federal government websites and apps.").

- "**dl**" (or **document location**) is a label meaning "the full URL . . . of the page on which content resides"[4]—here, https://robinhood.com/stocks/VTI. In other words, "VTI" is simply the page's name within the address of the publicly viewable page, not information coming from the user's account.
- Within the document location, "**?source=**" is a label showing "where [users] come from" before landing on this page.[5] Figure 4 shows merely that the user reached the VTI stock page from a "watchlist" area of the site—*not* the contents of any watchlist itself.
- "**dt**" (or **document title**) is a label meaning the "title of the page/document" the user is on[6]—here, "VTI - $320.90 | Robinhood." *See* Fig. 2 ("showing the search result page for the VTI ticker"). Again, this information captures the page title and not any information about the user or their account—and, indeed, this label value would be the same even for a non-account holder visiting this page (as a simple web search reveals).
- The cookie values ("**__Secure-3PSID**," etc.) depict Google's own cookies—not values Robinhood generated or sent to Google. ¶¶ 49-51 (alleging "the Google Trackers collect the NID and __Secure-3PSIDTS cookies," which Google "designed," to "identify consumers" on "the internet at large," and that the cookies "allow Google to correlate customers' activity with their Google accounts"); *see* ¶ 82 ("Plaintiff Dunn also holds a Google account and was logged into her Google account on the same device that she used to visit the Robinhood platform.").

Although Dunn alleges that Robinhood transmitted "her Robinhood account number" to Google, ¶ 84, she again provides no factual support for this claim. Figure 8's cropped screenshot instead reflects merely the web address of a page some user was on, which includes an "applink"

---

[4] *See, e.g.*, *Measurement Protocol Parameter Reference*, Google Analytics (June 13, 2024), https://web.archive.org/web/20240613002800/http://developers.google.com/analytics/devguides/collection/protocol/v1/parameters.

[5] *See, e.g.*, Adam Volle, *Query String*. Encyclopedia Britannica (Dec. 19, 2025), https://www.britannica.com/topic/query-string (defining "?source=" query string).

[6] *See, e.g.*, *Measurement Protocol Parameter Reference*, *supra* n.4.

parameter—a component of Robinhood's own internal web address[7]—that in turn contains an "account_number" reference and an accompanying value as part of that address. Fig. 8. In other words, the "account_number" reference appears as text within a page address—generated by particular navigations on Robinhood's website (*e.g.*, "enabling margin investing" from the "settings page," ¶ 69)—just as "VTI" appears within the address in Figure 4. Dunn does not (and cannot) allege that the number is hers or permits access to any purported account. At most, Dunn alleges it reflects a reference to an account number segment embedded in the address of a page that someone (she does not identify who) visited.

**B. Dunn agreed to Robinhood policies disclosing the use of Google Analytics.**

Dunn, again, has been a Robinhood customer for at least five years. ¶ 81. Like every Robinhood customer, she was required to agree to several terms to open and maintain her account, including the Robinhood Customer Agreement and the Robinhood Privacy Policy. O'Such Decl. ¶ 4; *see also* Exs. A-E. The Privacy Policy clearly disclosed the practices giving rise to Dunn's complaint. Specifically, the Privacy Policy:

- disclosed that Robinhood collects "Usage Information," consisting of "information about . . . *your actions on the Services*," Ex. C at 2 (emphasis added); *see also* Ex. D at 3-4; Ex. E at 3;
- disclosed that Robinhood used this information (and all information it collects) to "[c]onduct research *and analytics* to understand our visitors and customers and tailor our product offerings," Ex. C at 5 (emphasis added); *see also* Ex. D at 6-7 (disclosing Robinhood "use[s] the information" to "analyz[e] usage"); Ex. E at 5-6 (same); and

[7] The "applink" portion is a query-string parameter within Robinhood's own web address. *See Query String, supra* n.5. It is not clear from the face of the complaint precisely what Robinhood's "applink" parameter refers to, but the term "app link" is commonly used to describe a type of "deep link"—a link that directs a user to specific content within an application rather than to a generic home page. *See, e.g.*, *Deep Linking*, Wikipedia.com (last visited Aug. 24, 2026), https://en.wikipedia.org/wiki/Deep_linking; *Allowing Apps and Websites to Link to Your Content*, Apple Developer (last visited Aug. 24, 2026) ("Use universal links to link directly to content within your app."), https://developer.apple.com/documentation/xcode/allowing-apps-and-websites-to-link-to-your-content; *About App Links*, Android Developers (last visited Aug. 24, 2026), https://developer.android.com/training/app-links.

- disclosed that service providers would have access to usage information, including through cookies: "[W]e, and *our third-party partners, automatically collect certain types of usage information . . . through a variety of tracking technologies, including cookies*," Ex. C at 3 (emphasis added); *see also* Ex. D at 4; Ex. E at 4.

In fact, Robinhood's Privacy Policy—both when Dunn created an account and throughout the proposed class period—explicitly told account holders that "We use Google Analytics . . . when you use our Services," linking directly to Google's detailed explanation of Google Analytics practices: "For information on how Google Analytics collects and processes data, . . . see 'How Google uses data when you use our partners' sites or apps' linked here: http://www.google.com/policies/privacy/partners/." Ex. C at 7 (color and underlining in original, indicating hyperlink); *see also* Ex. D at 10; Ex. E at 8. The Privacy Policy disclosed to Robinhood users that Google Analytics can "collect information about your use of our Services . . . through cookies or similar tracking technologies," including for "analytics." Ex. C at 7; *see also* Ex. D at 10; Ex. E at 8-9. The linked Google policies in turn committed that "Google Analytics will act as a service provider to its customers (when data sharing with Google products and services is disabled)" and "will only use data collected on behalf of [Robinhood] in Google Analytics to provide the Google Analytics services." Ex. G at 2.[8]

**C. Despite agreeing to the use of Google Analytics, Dunn now brings claims recharacterizing it as illegal wiretapping.**

Despite expressly consenting to Robinhood's use of Google Analytics, Dunn brought this suit alleging that the alleged transmission of such basic web activity to Google Analytics violates federal and state laws. Specifically, she claims that Robinhood violated ECPA (¶¶ 102-11), CIPA (¶¶ 112-25), a duty to avoid negligent disclosures (¶¶ 126-48), and the CCPA (¶¶ 149-58), breached an implied contract (¶¶ 159-70), intruded upon her seclusion (¶¶ 171-77), and breached a duty of confidence (¶¶ 178-83). Tellingly, Dunn does not allege that she has experienced any concrete harms as a result of Robinhood's use of Google Analytics, founding her complaint instead on conclusory allegations of "loss of privacy," "diminution in the value of [her] non-public financial information," and "emotional

---

[8] Dunn does not (and cannot credibly) allege that data sharing was enabled for Robinhood's use of Google Analytics here.

and mental distress and anguish." ¶ 146.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss, the Court must separate the complaint's legal conclusions from its factual allegations. *Id.* at 678-79. The factual allegations must "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and the Court may also consider judicially noticeable facts and documents incorporated by reference, *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). If the alleged facts are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). The Court may dismiss claims based on dispositive issues of law. *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015).

## ARGUMENT

### I. Dunn's consent to Google Analytics forecloses all of her claims.

This Court should dismiss the complaint in full because Dunn consented to allow her Robinhood activity to be shared with Google Analytics. Consent is a threshold issue that forecloses every claim in this case. As this Court has explained, "[c]onsideration of consent is appropriate on a motion to dismiss," which can be supported, as here, with documents that are "incorporated by reference" or "'proper subjects for judicial notice.'" *Lakes*, 777 F. Supp. 3d at 1053-54; *see also Smith*, 745 F. App'x at 8-9 (affirming dismissal based on consent). Independently, Robinhood's consent requires dismissal of the ECPA claim.

#### A. Dunn's consent defeats all claims.

Dunn's consent to Robinhood's use of Google Analytics precludes each of her seven claims. 18 U.S.C. § 2511(2)(d) (ECPA); Cal. Pen. Code §§ 631(a), 632(a) (CIPA); Cal. Civ. Code § 3515 (negligence); Cal. Civ. Code § 1798.150(a)(1) (CCPA); *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (contract); *Lakes*, 777 F. Supp. 3d at 1058 (intrusion upon seclusion). Dunn pleads the bare legal conclusion that she "never gave her consent to Robinhood or anyone else to collect or intercept any of her private information." ¶ 86; *see* ¶ 73. But this Court is "not bound to accept as true

a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). And Dunn in fact expressly consented to Robinhood's use of Google Analytics. She cannot now feign shock that Robinhood did exactly what she agreed to when she chose to open an account.

Dunn agreed to Robinhood's terms and policies when creating her account. ¶ 81; O'Such Decl. ¶ 4; *see Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516-17 (9th Cir. 2023) (explaining how account registration processes, like the one Dunn alleges, secure assent). That action establishes consent because a "reasonable user viewing the disclosures" would have understood the terms and policies to have "unambiguously disclosed the data collection" that she now attacks. *Calhoun*, 113 F.4th at 1147-48. Robinhood explicitly disclosed that it uses "third-party partners" via "cookies" and other "tracking technologies" to conduct "analytics." Ex. C at 3, 5; *see also* Ex. D at 4, 7; Ex. E at 4, 6. And Robinhood explicitly disclosed that it "use[s] Google Analytics" in particular, while linking to details about how Google Analytics collects and processes customer information, including that "your web browser automatically sends certain information to Google," such as "the URL of the page you're visiting." Ex. C at 7; Ex. F at 1; *see also* Ex. D at 10; Ex. E at 8-9.[9]

Robinhood's disclosures exactly match the data categories that Dunn alleges were transmitted to Google Analytics here:

- As to names and prices of securities reflected in URLs or website document titles ("dt") that Dunn visited, ¶ 84, the Privacy Policy defines "Usage Information" to include a user's "actions on the Services," and discloses that Robinhood's "third-party partners" will "automatically collect" such information "through a variety of tracking technologies, including cookies." Ex. C at 2-3; *see also* Ex. D at 3-4 (defining "Usage Information" to include "pages or features you use"); Ex. E at 3 (same). The Google page referenced and linked in Robinhood's Privacy Policy also specifically discloses that, when you visit a site that uses Google Analytics, "your web browser automatically sends certain information to

[9] Although Dunn does not allege that Robinhood disclosed any data to Google Ads, the Privacy Policy also clearly disclosed Robinhood's participation in interest-based advertising with third-party partners. Ex. C at 7; *see also* Ex. D at 10-11; Ex. E at 8-9.

Google," including "the URL of the page you're visiting." Ex. F at 1. That is the entirety of what Figures 3, 4, 6, and 7 of the complaint depict. *See supra*, at 3-6.

- As to instances when the "?source=" label shows that the user got to the page from the "watchlist" area of the website (or via an applink with an embedded "account_number" segment), ¶¶ 66-67 & Fig. 4, ¶ 69 & Fig. 8, Dunn again agreed that Robinhood could collect and share Usage Information about her "actions on the Services" with Robinhood's "third-party partners." Ex. C at 2-3; *see also* Ex. D at 3-4 ("pages or features you use"); Ex. E at 3 (same).
- As to "identifiers allowing Google to specifically identify her," ¶ 84, the complaint points only to Google's own cookies—like "NID and __Secure-3PSIDTS"—which the complaint alleges Google "designed" and uses "to identify consumers," ¶¶ 49-51, on a browser where Dunn was, by her own account, "logged into her Google account," ¶ 82. Those are not identifiers Robinhood collected or shared. In any event, the Privacy Policy disclosed that Robinhood and its "third-party partners" "automatically collect certain types of usage information . . . through a variety of tracking technologies, including cookies." Ex. C at 3; *see also* Ex. D at 4; Ex. E at 4.

Dunn's agreements with Robinhood repeatedly disclosed the specific data practices to which she was consenting. This explicit, detailed disclosure of the precise categories of data collected on Robinhood's website and processed by third-party service providers—including Google Analytics as further detailed in the linked Google policies—far exceeds what consent requires. No reasonable user "could have plausibly interpreted the [Privacy Policy's] language as not disclosing" that Robinhood would use Google Analytics. *Lakes*, 777 F. Supp. 3d at 1055 (quoting *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789-90 (N.D. Cal. 2019)). Dunn's agreement to the Privacy Policy forecloses her claims. *See, e.g.*, *Smith*, 745 F. App'x at 8-9 (policies disclosing third-party data collection established consent and defeated ECPA, CIPA, negligence, and intrusion claims); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021) ("Courts consistently hold that terms of service and privacy policies . . . can establish consent."). This Court should dismiss the entire complaint on this ground. And because no amendment can alter the terms Dunn accepted or the

disclosures she received, dismissal of all seven counts should be with prejudice. *See Lakes*, 777 F. Supp. 3d at 1060 ("Plaintiffs cannot amend their complaint to overcome the issue of consent.").

**B. Robinhood's consent independently defeats the ECPA claim (Count I).**

Robinhood's consent independently requires dismissal of Dunn's claim under ECPA, which is a one-party-consent statute. ECPA's wiretapping prohibition does not apply when "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d). Robinhood is a party to the alleged communication, so its consent is "a complete defense" to an ECPA claim. *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1026 (N.D. Cal. 2014). Dunn herself pleads Robinhood's consent. She alleges that Google "intercepted the communications between consumers and Robinhood," making Robinhood a party to the communication. ¶ 34. She also alleges that Robinhood exercised its "exclusive control" to "install[]," "embed[]," and "employ[]" Google Analytics on its website. ¶¶ 3, 30-33. A party that allegedly configured its own website to route its communications to a third party has necessarily consented to that third party's receipt of them. *See Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023). Robinhood's consent therefore forecloses Count I on its face.

**II. Dunn independently fails to state any claim.**

**A. Dunn fails to state a violation of ECPA (Count I) or CIPA (Count II).**

Dunn has not pleaded a viable theory of wiretapping under ECPA or CIPA. She has not plausibly alleged (1) that Google was a third party to the communication when it acted as Robinhood's service provider, (2) that Robinhood could be held secondarily liable, or (3) that Google committed a primary violation. At every turn, Dunn tries to expand the statutes far beyond their text. That attempt defies ordinary principles of statutory interpretation, backed up here by the rule of lenity, which requires ambiguities to be resolved against liability because both ECPA and CIPA have criminal sanctions. *See Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1118 (N.D. Cal. 2025).

**1. Google, as Robinhood's service provider, was a party to the communications.**

Parties cannot intercept or eavesdrop on their own communications. 18 U.S.C. § 2511(2)(d); Cal. Pen. Code §§ 631(a), 632(a). For that reason, "[b]oth [ECPA and CIPA] contain an exemption

from liability for a person who is a 'party' to the communication." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020). Robinhood was a party to Dunn's communications on Robinhood's website. ¶ 34. Dunn alleges, however, that Robinhood is liable for allowing a purported third party—Google—to intercept those communications. Yet the term "party" includes not only the sender and recipient of a communication, but also "service provider[s]" that are an "extension" of the speaker or recipient. *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021). Here, Google Analytics was an extension of Robinhood, as more specific federal and state statutes governing the sharing of personal data—including for "analytic services," Cal. Civ. Code § 1798.140(e)(5)—confirm.

***Google Analytics was an extension of Robinhood's platform.*** Dunn's own allegations reflect that Google Analytics acted as an extension of Robinhood and thus was a party to those communications too. Google Analytics meets the "extension" test because Google merely "provid[ed] a tool that allow[ed] [Robinhood] to 'record and analyze its own data in aid of [Robinhood's] business.'" *Jones v. Peloton Interactive, Inc.*, 720 F. Supp. 3d 940, 946 (S.D. Cal. 2024) (quoting *Graham*, 533 F. Supp. 3d at 832); *accord, e.g.*, *Yale v. Clicktale, Inc.*, 2021 WL 1428400, at *3 (N.D. Cal. Apr. 15, 2021); *Johnson v. Blue Nile, Inc.*, 2021 WL 1312771, at *2 (N.D. Cal. Apr. 8, 2021). Google Analytics is a service provider that aggregates and analyzes activity data on Robinhood's website only for Robinhood's benefit, using Robinhood's own data. ¶ 42; Ex. G at 2. Robinhood's "us[e] [of] a third-party company to perform data analytics for web traffic" simply "is worlds different from wiretapping and eavesdropping." *Eating Recovery*, 806 F. Supp. 3d at 1119.

Like other plaintiffs who have sought to evade the extension test, Dunn "makes a conclusory assertion that [Google] is using the data collected for its own purposes." *Jones*, 720 F. Supp. 3d at 946; *see* ¶ 73. To the contrary, the Google resources that Dunn herself cites—which were incorporated into the Robinhood agreements Dunn agreed to—provide that "Google Analytics will act as a service provider" and "will only use data collected on behalf of the customer . . . to provide the Google Analytics services." Ex. G at 2; *see* ¶¶ 60 & n.3, 62 & n.6. Because Google bound itself not to use Robinhood's data for Google's own purposes, Google did not "ha[ve] the capability to use these communications for any purpose other than furnishing" analytics to Robinhood. *Yockey v. Salesforce, Inc.*, 688 F. Supp. 3d

962, 973 (N.D. Cal. 2023); *see also Licea v. Am. Eagle Outfitters, Inc.*, 659 F. Supp. 3d 1072, 1083 (C.D. Cal. 2023).

***More specific privacy statutes confirm that Robinhood could share data with its service providers.*** Treating Google as an outsider to Dunn's communications with Robinhood also would bring ECPA and CIPA into conflict with three more recent statutes that specifically regulate the collection and disclosure of customer information: the GLBA, 15 U.S.C. § 6801 *et seq.*; the CFIPA, Cal. Fin. Code § 4050 *et seq.*; and the CCPA, Cal. Civ. Code § 1798.100 *et seq.* These laws expressly permit companies to disclose their users' personal information to third-party service providers—including "analytic services"—even without customer consent. The GLBA generally requires financial institutions to provide an opt-out opportunity before disclosing "nonpublic personal information" for certain marketing purposes but requires no opt out for a disclosure to a "nonaffiliated third party" that "perform[s]" "services . . . on behalf of the financial institution." 15 U.S.C. § 6802(b)(2). The CFIPA, which generally requires consent to disclosures for certain advertising purposes, also exempts service providers from that requirement. Cal. Fin. Code § 4056(b)(9). And the CCPA—California's comprehensive privacy law—requires companies to provide an opt-out from the sale or sharing of personal information to third parties for certain types of advertising, but *not* for business purposes that involve sharing data with a "service provider"—including specifically companies that "provid[e] analytic services." Cal. Civ. Code § 1798.140(e)(5); *see id.* § 1798.140(ag)(1) (defining "[s]ervice provider" as entity that "receives from . . . [a] business [a] consumer's personal information for a business purpose"); *id.* § 1798.140(ai) (exempting "service provider" from definition of "[t]hird party").

Dunn's claims thus run headlong into the "general-specific canon." *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1164 (9th Cir. 2022). That canon, applicable to both federal and California statutes, embodies the "basic principle of statutory construction" "that a statute dealing with a narrow, precise, and specific subject is not submerged by a . . . statute covering a more generalized spectrum." *Radzanower*, 426 U.S. at 153; *see Rose v. California*, 19 Cal. 2d 713, 723-24 (1942). The rule that "'the specific governs the general'" has special force when the legislature "'has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'"

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). And where the more specific statute is also the more recent one, its "specific policy" should "control [the] construction of [an earlier] statute." *United States v. Estate of Romani*, 523 U.S. 517, 530-31 (1998).

Dunn would invert the general-specific canon by reading two older statutes about wiretapping generally—ECPA and CIPA—to prohibit conduct expressly permitted by three more recent statutes governing online disclosure of personal information specifically. But the path to harmonization runs in the opposite direction: The GLBA, CFIPA, and CCPA each expressly allow companies to disclose personal information to service providers without any opt-out or consent requirement, including for analytics services, so neither ECPA nor CIPA should be read to "submerge[]" those specific authorizations. *Radzanower*, 426 U.S. at 153; *see RadLAX*, 566 U.S. at 645. Simply put, the GLBA, CFIPA, and CCPA lay down the governing rules for Robinhood's conduct in this context. Inserting ECPA and CIPA would do damage to these carefully crafted legislative schemes for financial information, website data collection, and the use of analytic services.

For these reasons, at least two state courts in California have read provisions of CIPA as not applying at all to certain data disclosures covered by the CCPA. *Balabbo v. Wildflower Brands, LLC*, 2026 WL 1122773, at *8 (Cal. Super. Apr. 6, 2026); *Rodriguez v. Ink Am. Int'l Grp. LLC*, 2025 WL 4034985, at *4 (Cal. Super. Dec. 10, 2025). As one of those courts explained, in "harmoniz[ing]" CIPA and the CCPA, a court may not "infer a legislative intent to criminalize the very process of recording or capturing information under the CIPA when that process is permitted under detailed circumstances under the CCPA." *Balabbo*, 2026 WL 1122773, at *8 (quoting *Hohenshelt v. Superior Ct.*, 18 Cal. 5th 310, 331 (2025)). The same reasoning applies with more force in this case because the GLBA and CFIPA govern the even more specific topic of a *financial* institution's alleged disclosures of *financial* information to operate its business. As Dunn herself acknowledges, "[t]he type of harm" allegedly at issue in this case is precisely "the type of harm the GLBA" and "CFIPA" were "intended to guard against." ¶¶ 133, 136.

In short, Google was an extension of Robinhood (not a third party to the communication) under ECPA and CIPA. The general-specific canon further compels that interpretation to avoid conflict with the GLBA, CFIPA, and CCPA even if Dunn had a plausible textual argument under ECPA and CIPA.

This Court should therefore dismiss Counts I and II on the ground that Google Analytics, acting as a service provider to Robinhood, was a party to the communications.

**2. Dunn has not alleged a viable theory of secondary liability for Robinhood.**

Dunn also has no viable claims under ECPA and CIPA because she has failed to allege secondary liability. Dunn does not (and cannot) allege that Robinhood itself intercepted her communications, which again *she* made *to* Robinhood. Instead, she alleges that *Google* intercepted her "communications" (which, again, were simply the URLs of the pages users viewed or came from) and that Robinhood is secondarily liable for "aiding" Google by using Google Analytics. ¶ 121; *see* ¶ 109 (alleging Robinhood "procured another person to intercept" her communications under ECPA); ¶ 114 (emphasizing aiding-and-abetting language in CIPA). Neither ECPA nor CIPA § 632 creates any secondary liability. Dunn also does not allege that Robinhood had the requisite intent for aiding and abetting. And she does not allege that Google committed a primary violation under CIPA that could even give rise to secondary liability.

***ECPA and CIPA § 632 do not impose secondary civil liability.*** Courts do not infer the availability of civil aiding-and-abetting liability when a statute is silent on the subject. *See Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1893 (2026) (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 175-77 (1994)). Here, neither ECPA nor CIPA § 632 imposes civil liability on aiders and abettors.

Starting with ECPA, Dunn seeks damages under its civil liability provision, 18 U.S.C. § 2520, which authorizes suits by those whose communications have been "intercepted, disclosed, or intentionally used in violation of this chapter" against *only* "the person or entity . . . which engaged in that violation." 18 U.S.C. § 2520(a). As its text reflects, "§ 2520 does not impose civil liability on aiders or abettors." *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1247 (10th Cir. 2012); *see Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 169 (5th Cir. 2000) (holding that § 2520 does not impose liability for "procuring interception by another"); *cf. Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1002 (9th Cir. 2006) ("[W]e decline to read . . . claims for secondary liability" "into the text of [two other ECPA provisions]."). Courts in this District and elsewhere therefore routinely dismiss secondary-liability claims for civil damages under ECPA. *See, e.g.*, *In re Toys R Us, Inc. Privacy Litig.*, 2001 WL

34517252, at *4, *6-7 (N.D. Cal. Oct. 9, 2001) (dismissing ECPA claim that defendant "loaded a code" on its website that "allowed" third party to intercept communications because "plaintiffs d[id] not allege that [defendant] itself intercepted" the communications and § 2520 "does not provide a cause of action against aiders and abetters" or for "procurement"); *see also Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169, at *7 (N.D. Cal. Apr. 4, 2025); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1089-90 (N.D. Cal. 2015); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001); *Shefts v. Petrakis*, 954 F. Supp. 2d 769, 776 (C.D. Ill. 2013). This Court should do the same here.

The same defect exists for Dunn's claim under CIPA § 632. Compared with § 631, which expressly covers one who "aids, agrees with, employs, or conspires with any person" to violate the provision, Cal. Pen. Code § 631(a), the California legislature omitted similar language from § 632, which covers only a person who "*uses* an electronic amplifying or recording device to eavesdrop upon or record" a "confidential communication," *id.* § 632(a) (emphasis added). "The plain language of § 631 allows for derivative liability, and the language of § 632 does not," foreclosing "derivative liability" under the latter. *J.S. v. Spring Fertility Holdings, LLC*, 2026 WL 1483490, at *5-6 (N.D. Cal. May 27, 2026); *accord Stoba v. Saveology.com, LLC*, 2014 WL 3573404, at *4 (S.D. Cal. July 18, 2014) (holding that aiding-and-abetting claims are unavailable under § 632). This Court should dismiss Dunn's secondary-liability claim under § 632.

***Dunn also fails to allege that Robinhood intended to aid and abet any violation.*** Aiding-and-abetting liability exists only when the defendant intended to aid the primary violation. Under the common-law standard, a party is liable for aiding and abetting when it "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the [party's] own conduct, separately considered, constitutes a breach of duty to the third person." *Cork v. CC-Palo Alto, Inc.*, 534 F. Supp. 3d 1156, 1190 (N.D. Cal. 2021) (quoting *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 744-45 (2010)). "This standard requires that the defendant have *actual knowledge* of the *specific primary wrong* the defendant substantially assisted." *Id.* (quoting *Simi Mgmt. Corp. v. Bank of Am. Corp.*, 2012 WL 259865, at *4 (N.D. Cal. Jan. 27, 2012)). Dunn does not allege that Robinhood had the culpable mindset required by the common-law standard. *See Twitter, Inc. v. Taamneh*, 598

U.S. 471, 491 (2023).

Although some courts have applied a more lenient standard, even those courts still hold that CIPA § 631 "requires at least knowledge that the third parties' conduct would violate the statute." *Spring Fertility*, 2026 WL 1483490, at *4; *see also Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 942-43 (N.D. Cal. 2024). That test requires allegations that the defendant disclosed data "knowing it had no lawful basis to" do so. *Spring Fertility*, 2026 WL 1483490, at *5. Even under the more lenient standard, Dunn has not plausibly alleged that Robinhood knew it had "no lawful basis" for disclosing the data to Google or that it knew Google's conduct would violate ECPA or CIPA. *Id.* To the contrary, Robinhood disclosed its use of Google Analytics in the Privacy Policy, precluding any plausible assertion that it knew such disclosed use was unlawful. *See supra*, at 6-7; *see also Esparza v. UAG Escondido A1 Inc.*, 2024 WL 559241, at *6 (S.D. Cal. Feb. 12, 2024) (finding no intent even when defendant intentionally embedded third party's code onto its website); *YETI Coolers*, 754 F. Supp. 3d at 943 (same).

Regardless, Robinhood's thorough efforts to comply with the more specific regimes established by the GLBA, CFIPA, and CCPA for the disclosure of data to service providers, including "analytic services," undercut any inference that Robinhood intended to aid and abet a violation of CIPA. *See supra*, at 13-15.[10] Dunn's allegations fall far short of pleading aiding-and-abetting liability under § 631.

**3. Dunn has not alleged a primary violation by Google.**

This Court also should dismiss the aiding-and-abetting claim against Robinhood under CIPA §§ 631 and 632 because Dunn has not adequately alleged an "underlying" primary violation by Google. *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1003 (N.D. Cal. 2024) (citing *People v. Perez*, 35 Cal. 4th 1219, 1225 (2005)). In pleading her CIPA claim, Dunn repeatedly asserts that Robinhood allowed Google to "intercept" her communications. ¶¶ 115-16, 118, 121-22. This is a non sequitur. "Intercept" appears nowhere in § 631. Instead, § 631 more specifically imposes liability for one who "reads, or

[10] Indeed, Robinhood's GLBA Financial Privacy Notice, excerpted in Figure 9 of the complaint, reflects a deliberate intent to comply with the requirements of GLBA for the disclosure of information. *See* Ex. H. And the Google Analytics policies linked in the Privacy Policy Dunn accepted specifically reference the requirements of U.S. state privacy laws, including the CCPA, when committing to act as a service provider for customers using Google Analytics. Ex. G at 1-2.

attempts to read, or to learn the contents or meaning of any message, report, or communication *while the same is in transit*." Cal. Pen. Code § 631(a) (emphasis added). Dunn meets neither the reading nor in-transit requirements. And neither § 631 nor § 632, which protect communications like phone conversations, was ever meant to apply to web analytics, which do not involve a communication in any genuine sense.

***Dunn has not plausibly alleged that Google "read" or "attempt[ed] to read" or "learn" her communications while they were "in transit."*** Section 631 "requires some effort at understanding the substantive meaning of" the communication. *Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989, 995 (N.D. Cal. 2024). Dunn makes no such allegation. As the Ninth Circuit recently held, a third party that merely receives web data has not read or attempted to "read" it. *Gutierrez v. Converse Inc.*, 2025 WL 1895315, at *1 (9th Cir. July 9, 2025) (affirming summary judgment because, while plaintiff's chats were sent to Salesforce, CIPA requires proof that "Salesforce accessed chat data" and that "Salesforce read or attempted to read *her* chat message," whereas plaintiff "[a]t best" showed that "Salesforce *could* read [her] messages"). But even assuming Google did at some point "read" or "attempt to read" Dunn's URL data, Google certainly did not do so during the fleeting moment in which that data was "in transit." Multiple courts in this District have recently held that the "in transit" requirement is not satisfied when a third party merely "intercepted communications and stored them in a server" but "didn't actually read or attempt to read the communications while they were in transit" as "packets" of data traveling from the user's computer to the website provider. *Eating Recovery*, 806 F. Supp. 3d at 1116-17; *see Spring Fertility*, 2026 WL 1483490, at *5; *Dellasala v. Samba TV, Inc.*, 2026 WL 1138358, at *6 (N.D. Cal. Apr. 21, 2026); *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025); *Heiting v. Taro Pharm. USA, Inc.*, 728 F. Supp. 3d 1112, 1126 (C.D. Cal. 2024). Here, too, Dunn's own allegations reflect that, if Google ever read or attempted to read her URL data, such action occurred only *after* that data was transmitted to Google. ¶ 46 ("*Once* Google's software code collects the data surreptitiously intercepted from the Robinhood website, it packages the information and sends it to Google Analytics for processing." (emphasis added)); ¶ 47 ("*After* the data has been processed and stored in the database, Google uses this data to generate reports to help analyze

the data from the webpages." (emphasis added)).[11]

***CIPA does not regulate website analytics.*** Dunn's claims suffer from a more fundamental defect. CIPA does not regulate web analytics in the first place. The statute, which was enacted in 1967, was "not drafted with the internet in mind," and it targets particular harms—"wiretapping and eavesdropping"—that are "worlds different" from "using a third-party company to perform data analytics for web traffic." *Eating Recovery*, 806 F. Supp. 3d at 1115, 1119. Because of this mismatch, at least one court in this District has "question[ed] whether the [California] Legislature intended for CIPA to apply to the type of conduct implicated by this case at all." *Id.* at 1118-19. And since then, two California state courts have held that another provision of CIPA does not apply to web cookies, which facilitate analytics. *See Balabbo,* 2026 WL 1122773, at *8; *Rodriguez*, 2025 WL 4034985, at *3-4. This Court should likewise hold that CIPA §§ 631 and 632 do not apply to website analytics.

CIPA's language is "ill-suited for application to internet communications." *Eating Recovery*, 806 F. Supp. 3d at 1119. Section 631 hinges on whether someone has "read" a "message, report, or communication" while it is "in transit." Cal. Pen. Code § 631(a). But those terms, which made sense as applied to telephone lines in the 1960s, are nonsensical as applied to web cookies, which do not "read" information, let alone while it is in "transit" and often encrypted and unreadable. For example, courts have struggled to determine whether filtering personal information out of data received through cookies before processing might itself count as "reading" the data. *Eating Recovery*, 806 F. Supp. 3d at 1117. Section 632, meanwhile, requires the use of an "electronic amplifying or recording device," antiquated language that poorly fits small computer-code text files like web cookies. Cal. Pen. Code § 632(a).

CIPA's amendment history further suggests the California legislature did not intend the statute to apply in this context. CIPA has been amended over the years to add provisions about "cellular radio telephones" and "cordless telephones." Cal. Pen. Code §§ 632.5, 632.6. But the legislature "has never, in over four decades, amended" the statute "to adapt its language to the digital age." *Eating Recovery*,

[11] In *Shah v. Capital One Financial Corporation*, 768 F. Supp. 3d 1033, 1053-54 (N.D. Cal. 2025), this Court found in-transit allegations sufficient for that particular complaint, but without the opportunity to consider the Ninth Circuit's subsequent decision in *Gutierrez* and the subsequent growing consensus in this District that the plaintiff must allege that the third party read or attempted to read the data while it was in transit, particularly in light of the rule of lenity. *See Eating Recovery*, 806 F. Supp. 3d at 1118.

806 F. Supp. 3d at 1119. Meanwhile, the legislature has adopted other statutes that specifically address the online sharing of consumer data (the CCPA) and financial information (CFIPA), making the legislature's failure to amend CIPA to add similar language all the more glaring. The legislature, not the judiciary, should be the one to extend and adapt wiretapping prohibitions for this fundamentally different context.

Finally, the rule of lenity requires that any remaining doubts be resolved against criminal liability and civil penalties. *Eating Recovery*, 806 F. Supp. 3d at 1118. Courts should avoid interpretations of criminal statutes that "would attach criminal penalties to a breathtaking amount of commonplace computer activity"—especially when liability turns on highly technical details that will not be apparent to ordinary people. *Van Buren v. United States*, 593 U.S. 374, 393 (2021). If the California legislature had intended to criminalize as commonplace a computer activity as website analytics, it surely would have spoken more clearly.

**B. Dunn has not stated a negligence claim (Count III).**

This Court should dismiss the negligence claim for three independent reasons: (1) Dunn's negligence per se theory is unavailable here; (2) Robinhood had no duty not to disclose information in circumstances the GLBA and CFIPA expressly permit; and (3) the economic-loss rule would bar the claim in all events.

First, this Court should dismiss Dunn's claim of negligence per se. "The doctrine of negligence per se is not a separate cause of action, but creates an evidentiary presumption that affects the standard of care in a cause of action for negligence." *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1046 (N.D. Cal. 2025) (quoting *Dent v. Nat'l Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020)). Any freestanding negligence per se theory is improper and should be dismissed.

Second, Dunn cannot allege any kind of negligence claim because, as discussed above, Robinhood's use of Google Analytics was statutorily authorized under the GLBA and CFIPA. The opt-out and consent requirements that Dunn invokes do not apply to Google Analytics because Google was Robinhood's service provider. *See supra*, at 11-15. And even if those requirements applied, Robinhood surpassed them by securing Dunn's consent through clear and conspicuous disclosures. *See supra*, at 6-7, 8-11. Because the GLBA and CFIPA affirmatively authorize the data disclosures Dunn

challenges, she cannot invoke the presumption of negligence per se or manufacture a duty under general negligence principles that would be inconsistent with those statutes. *See Verdugo v. Target Corp.*, 59 Cal. 4th 312, 341-42 (2014).

Third, Dunn cannot proceed on her claim because "purely economic losses are not recoverable in tort." *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 911 (N.D. Cal. 2024) (quoting *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1028 (E.D. Cal. 2013)). A "purely economic loss" is "pecuniary or commercial loss that does not arise from actionable physical, emotional or reputational injury to persons or physical injury to property." *Id.* Nothing in the complaint suggests that she could have experienced any harm as a result of Google Analytics providing insights to Robinhood that aggregated her use of Robinhood's services in usage reports. Nor does Dunn allege that anything ever happened to her—no fraud, no account compromise, no misuse of any data. *Cf. Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025) (holding a website visitor lacked a concrete injury where session-replay software captured only her product-browsing activity and street name, and likening such tracking to a store clerk observing which aisles shoppers frequent). Some courts in this District (including this Court) have declined to apply the economic-loss rule where plaintiffs allege non-economic harms such as "lost time and money incurred to mitigate the effect of the use of their information." *Capital One*, 768 F. Supp. 3d at 1046; *see, e.g.*, *Baton*, 740 F. Supp. 3d at 911 (crediting allegations of lost time spent on credit monitoring and reviewing fraud reports). But Dunn alleges no such harm here. Her alleged injuries are limited to "(1) loss of privacy; (2) diminution in the value of their non-public financial information . . . ; (3) lost value of [her] non-public financial information; and (4) emotional and mental distress and anguish." ¶ 146.

Dunn's conclusory allegation of "emotional and mental distress and anguish" does not trigger the personal-injury exception to the economic-loss rule. To invoke that exception, a plaintiff must assert a feasible tort claim for the emotional distress—one resting on a duty independent of the parties' contract. *Elsayed v. Maserati N. Am., Inc.*, 215 F. Supp. 3d 949, 962 (C.D. Cal. 2016). California's economic-loss rule "bars claims that 'arise from—or are not independent of—the [parties'] underlying contracts.'" *Calise v. Meta Platforms, Inc.*, 810 F. Supp. 3d 1038, 1049 (N.D. Cal. 2025) (quoting *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922-23 (2022)). Here, Dunn identifies no tort duty

independent of her contractual relationship with Robinhood that would support such recovery. ¶¶ 161-69.

**C. Dunn has not stated a CCPA claim (Count IV).**

The Court should also dismiss the CCPA claim because Dunn has not alleged the disclosure of the types of sensitive personal information that can support a claim. Moreover, Dunn lacks a private right of action to enforce the provisions she invokes.

**1. Dunn fails to allege essential elements of a CCPA claim.**

Dunn's CCPA claims fail because she does not allege unauthorized disclosure, failure to implement and maintain reasonable security practices, or the disclosure of the narrow types of personal information that can support a private right of action under the CCPA.

The CCPA authorizes a private suit only when a consumer alleges "*unauthorized* access and exfiltration, theft, or disclosure" of specific types of personal information "as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information." Cal. Civ. Code § 1798.150(a)(1) (emphasis added). Dunn pleads no such unauthorized disclosure. To the contrary, she alleges that Robinhood "*intentionally* disclos[ed]" her information to Google. ¶ 138 (emphasis added). The alleged deliberate, purposeful disclosure of data—which Robinhood explained clearly in its Privacy Policy—is not "unauthorized," as § 1798.150(a)(1) requires. Nor is there any allegation that it resulted from a failure to "implement and maintain reasonable security procedures and practices." Cal. Civ. Code § 1798.150(a)(1). The CCPA does not turn the commonplace, fully disclosed use of Google Analytics into an unauthorized or unreasonable security procedure or practice.

Dunn separately has not alleged that Google gained access to the sensitive categories of personal information that the CCPA requires for its private right of action. Specifically, under Section 1798.150, a party may sue when a person's name is accessed without authorization in combination with specific types of sensitive data, such as a social security number, health insurance information, or unique biometric data. Cal. Civ. Code §§ 1798.150(a)(1), 1798.81.5(d)(1)(A). But none of the information allegedly transmitted to Google Analytics meets this requirement. Although Dunn alleges that "a Robinhood consumer's account number" was transmitted, Fig. 8, this is not sufficient in the

absence of allegations that an account number was shared "in combination with any required security code, access code, or password that would permit access to [her] financial account," as well as the user's name. Cal. Civ. Code § 1798.81.5(d)(1)(A)(iii). Dunn does not (and cannot) allege that her name was disclosed to Google, much less her account number in combination with her name or any password, access code, or other information that would permit access to her Robinhood account. Because Dunn has not alleged the unauthorized disclosure of personal information under the CCPA's narrow definition for the private right of action, the Court should dismiss Dunn's CCPA claim.[12]

**2. Dunn lacks a private right of action to enforce other CCPA provisions.**

In addition to her claim under § 1798.150, Dunn alleges that Robinhood violated California Civil Code §§ 1798.100 and 1798.115(d). ¶ 151. But those provisions do not create a private right of action and can be enforced only by the California Attorney General and the California Privacy Protection Agency. Cal. Civ. Code §§ 1798.155, 1798.199.90; *see Delgado v. Meta Platforms, Inc.*, 718 F. Supp. 3d 1146, 1155 (N.D. Cal. 2024). Plus, the CCPA specifically authorizes the very data disclosures alleged here to "service provider[s]" who provide "analytic services." Cal. Civ. Code § 1798.140(e)(5), (ag)(1).

**D. Dunn has not stated a claim of intrusion upon seclusion (Count VI).**

Under California law, there is a "high bar for establishing an invasion of privacy claim." *Capital One*, 768 F. Supp. 3d at 1047. Dunn must plausibly allege that "(1) [she] possess[es] a legally protected privacy interest, (2) [she] maintain[s] a reasonable expectation of privacy, and (3) the intrusion is 'so serious . . . as to constitute an egregious breach of the social norms' such that the breach is 'highly offensive.'" *Facebook Internet Tracking*, 956 F.3d at 601 (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)). This claim fails because, as discussed, Robinhood fully disclosed and secured Dunn's consent to its use of Google Analytics. *See supra*, at 6-7, 8-11. Dunn could not have possessed a legally protected privacy interest or reasonable expectation of privacy against Robinhood's use of Google Analytics when she consented to precisely that conduct. *See Hammerling*

[12] *Capital One* does not compel a different result. There, this Court did not address the issue of whether the data met the narrower definition of "personal information" that applies to the private right of action, apparently because the defendant did not move to dismiss based on these issues. 768 F. Supp. 3d at 1048-49.

*v. Google LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (finding no reasonable expectation of privacy because "the Policy here expressly disclosed Google's intention to track their activity"); *Yahoo Mail*, 7 F. Supp. 3d at 1037 (holding that, to have an expectation of privacy, "[t]he plaintiff . . . must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant.").

Separately, Dunn has not alleged an intrusion "of a kind that would be highly offensive to a reasonable man." *Popa*, 153 F.4th at 791 (citation and emphasis omitted) (quoting Restatement (Second) of Torts § 652B cmt. a). Dunn makes conclusory allegations that Robinhood transmitted to Google Analytics the "1) names and prices of securities she searched and holds in her account, 2) identifiers allowing Google to specifically identify her, and 3) her Robinhood account number," ¶ 84, though as previously discussed, the complaint alleges insufficient facts to support these allegations. *See supra*, at 3-6. Instead, the facts alleged in the complaint show merely that information about web pages a user visited on Robinhood were sent to Google Analytics for processing. Such "data collection and disclosure to third parties" is "routine commercial behavior" and is "not a highly offensive intrusion of privacy." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (quotation marks omitted), *aff'd*, 2024 WL 937247; *see also In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (transmission of a device's unique identifier, personal data, and geolocation information did not rise to an egregious invasion of privacy). Courts have held that "[e]ven disclosure of very personal information has not been deemed an 'egregious breach of social norms' sufficient to establish a constitutional right to privacy" for an intrusion-upon-seclusion claim. *Yahoo Mail*, 7 F. Supp. 3d at 1038 (quoting *Belluomini v. Citigroup, Inc.*, 2013 WL 3855589, at *6 (N.D. Cal. July 24, 2013)); *see Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (disclosure of Social Security numbers and other personal information held insufficient to constitute an egregious breach of social norms).

This case is therefore nothing like previous ones where this Court found the alleged transmission to be highly offensive. *See, e.g.*, *Ingraham v. Cap. One Fin. Corp.*, 2026 WL 1755170, at *7 (N.D. Cal. May 22, 2026) (holding that the alleged transmission of "personally identifiable information" such as "first and last names, email addresses, and phone numbers"; "citizenship status; employment status; bank account type; and the type of credit card a person applied for, was approved

for, or was denied" was "highly offensive"). After *Popa*, other courts evaluating alleged disclosures of financial information to Google Analytics have found the disclosures were not "highly offensive" even when (unlike here) they involved specific financial information, like "when users make a payment on their loans[], how users allocate payments[], and the reasons users request a deferment, forbearance, or other repayment options[]," especially where, as here, the plaintiff pleads no facts supporting her allegations that her own such data was disclosed. *Straight v. Edfinancial Servs., LLC*, 2026 WL 2087412, at *3 (N.D. Cal. July 20, 2026) (alterations in original); *see supra*, at 3-6. There is no cause for a different result in this case, which centers on Google Analytics having access to basic web activity for aggregated reporting.

**E. The express contracts foreclose Dunn's claims for breach of implied contract (Count V) and breach of confidence (Count VII).**

Dunn's express contracts with Robinhood not only establish consent to Google Analytics, but also separately bar her implied contractual theories. Under California law, a plaintiff "cannot also allege an implied contract" when she has an "express contract on the matter" with the defendant. *Capital One*, 768 F. Supp. 3d at 1050. The same principle applies to the breach-of-confidence claim, which is grounded in an implied or quasi-contractual duty of confidentiality. *Id.* at 1051 (citing *Berkla v. Corel Corp.*, 302 F.3d 909, 918 (9th Cir. 2002)). Here, Dunn acknowledges that she created a Robinhood account and therefore agreed to Robinhood's Customer Agreement and Privacy Policy, which expressly govern Robinhood's collection, use, and disclosure of customer information. ¶ 81; *see supra*, at 6-7, 8-11. Those express contracts preclude her implied theories—regardless of what the Court concludes about consent.

## CONCLUSION

Dunn agreed to the practice she now challenges, three statutes authorize it, and no amendment can change the terms she accepted or the disclosures she received. For each of the reasons above, the complaint should be dismissed in its entirety with prejudice.

Dated: August 24, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ S. Ashlie Beringer*
S. Ashlie Beringer

*Attorneys for Defendant Robinhood Markets, Inc.*