Will J. Edelman (SBN 285177)
Gary Klinger
**MILBERG PLLC**
227 W. Monroe St
Suite 2100
Chicago, IL 60606
Tel: 866-252-0878
Email: gklinger@milberg.com
Email: wedelman@milberg.com

Kara L. Kapp (SBN 300896)
**MILBERG PLLC**
5335 Wisconsin Ave NW
Suite 440
Washington, D.C. 20015
Tel: 516-620-4219
Email: kkapp@milberg.com

Albert J. Plawinski*
**PLAWINSKI, PLLC**
2101 Pearl Street
Boulder, Colorado 80302
Tel: (303) 720-7095
Email: albert@plawinski.law

**Pro Hac Vice Admission forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAMILLAH DUNN, KEVIN SMITH, ERIC DE LA LUZ, and ALAN STARZINSKI, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>ROBINHOOD MARKETS, INC., a Delaware company,<br><br>*Defendant.* | Case No. 3:26-CV-04291-TLT<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **Violation of 18 U.S.C. § 2511**<br>2. **Violation of Cal. Pen. Code § 631-632**<br>3. **Negligence**<br>4. **Violation of Cal. Civ. Code §§ 1798.100, 1798.115(d), 1978.150**<br>5. **Intrusion Upon Seclusion**<br>6. **Breach of Confidence** |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Jamillah Dunn, Kevin Smith, Eric De La Luz, and Alan Starzinski bring this class action complaint individually and on behalf of all others similarly situated against Defendant Robinhood Markets, Inc. ("Robinhood") for unlawfully disclosing consumers' sensitive financial information, including their securities holdings and stock portfolios, to unauthorized third parties without consumers' consent. Plaintiffs bring this action based on personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

1. Robinhood is a financial institution that provides an electronic trading platform that facilitates trading of stocks, exchange-traded funds, options, futures contracts, and other securities.

2. Consumers may search, view, and trade securities either on the Robinhood mobile app or the Robinhood website.

3. Unbeknownst to consumers, Robinhood embedded invisible trackers on its website from Google that transmit sensitive financial information to advertisers without the consumers' knowledge or consent.

4. The sensitive financial data that Robinhood shared with Google includes a consumer's full account number, the names of securities held in the consumer's portfolio, the current price of the security, the consumer's searches for securities, and additional web activity.

5. Robinhood's practice is particularly egregious because advertisers like Google can determine a specific consumer's net worth and financial health by monitoring their financial information over time, including granular data points such as the specific names of stocks and other assets in their portfolio and corresponding price and valuation changes over time. This allows Google to build a demographic profile on the consumer based on their net worth and target them with relevant advertisements. In other words, Robinhood allows the advertisement behemoth to access sensitive financial data for Google's own purposes and benefit, and Google would not have access to this sensitive and highly personal data but for Robinhood's conduct.

6. Worse yet, Robinhood's transmission of a ***consumer's full account number*** to Google

exposes the consumer to significant risk, including the potential for unauthorized access to the consumer's account, unauthorized transactions, fraud, and identity theft.

7. Unsurprisingly, Robinhood puts profits before its consumers and failed to protect consumers' sensitive financial information and failed to properly inform consumers about its data sharing practices—let alone obtain sufficient consent as mandated under the Gramm-Leach-Bliley Act and related state statutes.

8. Confidentiality is paramount in the financial industry, but Robinhood nonetheless disregarded well-known legal and ethical duties to protect and safeguard consumers' financial information. In the process, Robinhood breached consumers' trust.

9. Neither Plaintiffs nor any other Class Member authorized or gave any consent to Robinhood to share their sensitive financial information with Google.

10. Plaintiffs seek to remedy these harms and bring causes of action for (1) violation of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1); (2) Violation of the California Invasion of Privacy Act ("CIPA") Cal. Pen. Code § 631 *et seq*.; (3) Negligence; (4) Violation of the CCPA, Cal. Civ. Code ¶ 1978.150; (5) Intrusion Upon Seclusion; and (6) Breach of Confidence.

**PARTIES**

11. Plaintiff Jamillah Dunn is a natural person and citizen of the State of California.

12. Plaintiff Kevin Smith is a natural person and a citizen of the State of California.

13. Plaintiff Eric De La Luz is a natural person and a citizen of the State of California.

14. Plaintiff Alan Starzinski is a natural person and a citizen of the State of California.

15. Defendant Robinhood Markets, Inc. is a Delaware corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 85 Willow Road, Menlo Park, California 94025.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions

under that subsection apply to this action.

17. This Court has personal jurisdiction over Defendant because Defendant conducts business in this District, resides in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District.

18. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, in a substantial part, in the District.

## COMMON FACTUAL ALLEGATIONS

### A. Consumers' Financial Information Is Sensitive and Confidential

19. As a financial institution primarily engaged in buying and selling securities, Robinhood is subject to federal obligations including the Gramm-Leach-Bliley Act and state laws such as the California Financial Information Privacy Act and the California Invasion of Privacy Act.

#### *i. Defendant failed to Comply with the Gramm-Leach-Bliley Act*

20. Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

21. The GLBA defines a financial institution, as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A). Under 12 U.S.C. § 1843(k)(4)(A), Defendant engages in financial activities because its business is "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities."

22. Pursuant to the GLBA "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

23. These obligations apply to any information a consumer furnishes to a financial institution when obtaining any other financial product or service. The GLBA defines, "nonpublic personal information" as "personally identifiable financial information." 16 C.F.R. § 313.3(n)(1). The GLBA further defines personally identifiable financial information as any information:

> (i) A consumer provides to you to obtain a financial product or service from you;

> (ii) About a consumer resulting ***from any transaction involving a financial product or service*** between you and a consumer; or
>
> (iii) ***You otherwise obtain about a consumer*** in connection with providing a financial product or service to that consumer.

16 C.F.R. § 313.3(o)(1) (emphasis added).

24. The GLBA provides specific examples of what information constitutes "personally identifiable financial information" including:

> Information a consumer provides to you on an application to obtain a loan, credit card, or other financial product or service;
>
> The fact that an ***individual is or has been one of your customers*** or has obtained a financial product or service from you;
>
> Any information about your consumer if it is disclosed in a manner that ***indicates that the individual is or has been your consumer***; [and]
>
> Any information ***you collect through an Internet "cookie"*** (an information collecting device from a web server).

16 C.F.R. 313.3(o)(2)(A)-(F) (emphasis added).

25. Indeed, the GLBA prohibits financial institutions—like Robinhood—from disclosing nonpublic personal information to a nonaffiliated third party unless—

> (A) such financial institution ***clearly and conspicuously*** discloses to the consumer …that such information may be disclosed to such third party;
>
> (B) the consumer is given the opportunity**,** ***before the time that such information is initially disclosed,*** to direct that such information not be disclosed to such third party; ***and***
>
> (C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

15 U.S.C. § 6802(b) (emphasis added).

### *ii. Defendant Failed to Comply with the California Financial Information Privacy Act*

26. States also regulate the disclosure of consumers' financial information. The California Legislature enacted the California Financial Information Privacy Act ("CFIPA") because it found the "policies intended to protect financial privacy imposed by the Gramm-Leach-Bliley Act [to be] inadequate to meet the privacy concerns of California residents." Cal. Fin. Code § 4051.5. The CFIPA gives Californians the ability to control the disclosure of their nonpublic personal information by

"requiring that financial institutions that want to share information with third parties and unrelated companies seek and acquire the affirmative consent of California consumers prior to sharing the information." *Id.*

27. The CFIPA's author commented:

> [This law] will give consumers the final say in what happens to their personal financial information. The bill has been meticulously crafted and would be the strongest financial privacy bill in the nation, and will likely serve as a national model. ***It would generally require financial institutions such as banks, insurance companies and securities firms to get their customer's permission before they share a consumer's financial DNA with outside companies*** (opt-in)….Simply put, consumers should be the final arbiters of what happens to their personal financial information. And [this bill] will give them that right.

California Bill Analysis, S.B. 1 Assem., 8/18/2003 (emphasis added).

28. The obligations under the CFIPA are simple: "a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

29. The CFIPA has a strict opt-in requirement allowing financial institutions to share consumer financial information at the direction of the consumer and upon obtaining a "consent acknowledgment" from the consumer that meets specific statutory requirements. Cal. Fin. Code § 4053(a)(1). "A financial institution shall utilize a form, statement, or writing to obtain consent to disclose nonpublic personal information to nonaffiliated third parties…. The form, statement, or writing shall meet all of the following criteria:

> (A) The form, statement, or writing is a separate document, not attached to any other document.
>
> (B) The form, statement, or writing is dated and signed by the consumer.
>
> (C) The form, statement, or writing clearly and conspicuously discloses that by signing, the consumer is consenting to the disclosure to nonaffiliated third parties of nonpublic personal information pertaining to the consumer.
>
> (D) The form, statement, or writing clearly and conspicuously discloses (i) that the consent will remain in effect until revoked or modified by the consumer; (ii) that the consumer may revoke the consent at any time; and (iii) the procedure for the consumer to revoke consent.
>
> (E) The form, statement, or writing clearly and conspicuously informs the consumer that (i) the financial institution will maintain the document or a

> true and correct copy; (ii) the consumer is entitled to a copy of the document upon request; and (iii) the consumer may want to make a copy of the document for the consumer's records."

Cal. Fin. Code § 4053(a)(2).

**B. Robinhood Installed Invasive Tracking Technologies on Its Website**

30. Defendant Robinhood is a financial institution. Robinhood operates a trading platform and allows consumers to buy and trade securities such as stocks, ETFs, options, cryptocurrencies, among others (collectively "securities" or "stocks").

31. Consumers navigate to the Robinhood website where they search, view, and purchase securities. They can view current pricing of a security and view their current stock portfolio.

32. Robinhood installed third-party trackers on its website from Google (the "Google Trackers") that gather a vast assortment of sensitive financial data from consumers.[1] The installation of these trackers, and consequently the transmission of consumer data, is within Defendant's exclusive control.

33. When an individual accesses Robinhood's website, the Google Trackers instantaneously and surreptitiously duplicate communications with that webpage and send them to Google. The information travels directly from the website user's browser and then Google's server, based off instructions from the third party's tracker. The communications and information transmitted via these trackers are entirely within Robinhood's control.

34. The Google Trackers may not be deleted from the consumers' device. They are built into the website, and the consumer has no control or warning over their presence or data collection. The Google Trackers cause information to flow directly from the consumers' browser and the website owner server to the third-party itself. The consumer cannot prevent or even detect the transmission of data.

35. Here, Robinhood employed an array of Google Trackers to intercept, duplicate, and redirect Plaintiffs' and the Class Members' sensitive financial information to a third party, contemporaneously, invisibly, and without their knowledge or consent.

[1] The Google Trackers include Google Analytics, DoubleClick, and Google Tag Manager.

36. When Plaintiffs and the Class Members visited the Robinhood website and searched or viewed a particular security in his or her portfolio, they communicated the request to Defendant. In response, Defendant communicated the current stock price and more information about the security to the consumer. Google simultaneously intercepted the communications between consumers and Robinhood for its own purpose.

***The Google Tracker Collects Consumers Financial Information***

37. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars.

38. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[2] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year.

39. Google offers several products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. SDKs, or Software Development Kits, are a collection of reusable and prepackaged computer code that perform specific functions and processes. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products, increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more comprehensive profiles and data points on individuals.

40. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

[2] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

41. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

42. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

43. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

44. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms." It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."

45. Google Analytics is incorporated into third-party websites and apps, including the Robinhood website, by adding a small piece of JavaScript measurement code to each page on the site. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.

46. In other words, when interacting with the Website, the consumer sends a communication via an HTTP request to Defendants' server, and that server sends an HTTP Response that displays the website visible to the consumer.

47. Thus, Robinhood is essentially handing their consumers a tapped device. Once the webpage is loaded onto the consumer's browser, the software-based wiretap quietly waits for private

communications on the Robinhood website, which intercepts those communications intended only for Defendant, and transmits those communications to third parties like Google.

48. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

49. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

50. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad-targeting capabilities and data points on users.

51. The Google Analytics tracker is only an analytics tool in name; it serves the primary purpose of fueling Google's advertising platform. Google explicitly states that Google Analytics is one of many trackers comprising its advertising services: "To help our partners manage their advertising and websites, we offer many products, including AdSense, Google Ads, Google Analytics, and a range of DoubleClick-branded services.[3]"

52. Furthermore, Google explains that by interacting with a website with any Google tracked embedded—even the Google Analytics tracker—Google collects the data for its own purpose including, *inter alia,* improving its advertising and personalizing ads:

> For example, when you visit a website that uses advertising services like AdSense or Google Ads, including analytics tools like *Google Analytics*, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to *measure the effectiveness of ads, and, depending on your settings, to improve the*

[3] https://policies.google.com/technologies/ads

> *relevance of the ads you see.* We may also set cookies on your browser or read cookies that are already there. Apps that use Google advertising services also share information with Google, such as the name of the app and a unique identifier for advertising.
>
> *Google uses the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising,* protect against fraud and abuse, and *personalize content and ads* you see on Google and on our partners' sites and apps. (emphasis added). [4]

53. Robinhood utilizes the Google Trackers. As a result, Google intercepted the interactions of Robinhood's consumers with the website, including the names and prices of securities they searched and purchased. Google receives, at a minimum, the names of securities owned by Plaintiffs and the Class and the current price. Google also receives the customer's IP address, device information, and a host of cookies and other identifiers that allow Google to correlate customers' activity with their Google accounts.

54. For example, the Google Trackers collect the NID and __Secure-3PSIDTS cookies to identify consumers not only on Robinhood's website but also the internet at large. The "3PSIDTS" cookie is a third-party cookie used by Google for advertisement targeting and Google designed the cookie primarily to build user profiles. The NID cookie serves a similar purpose, and it helps to track consumers, for advertising and targeting purposes, for consumers signed out of their Google account. According to Google, "[t]he 'NID' cookie can be used to show ads in Google services for signed-out users.[5]"

55. As explained in more detail below, the Google Analytics tracker collected, among many others, the NID and the 3PSIDTS advertising cookies therefore Google utilized the intercepted communications for advertising purposes.

56. Additionally, upon receiving information from Robinhood, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

57. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked, and can provide a wide variety of

[4] https://policies.google.com/technologies/partner-sites?hl=en

[5] https://policies.google.com/technologies/cookies

data. Browser-fingerprints are personal identifiers. Google Analytics can collect browser-fingerprints from website visitors.

58. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."

59. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques. Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

60. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.

61. As enabled by Robinhood, Google collects vast quantities of consumer data through Google Analytics.

62. Due to the vast network of consumer information held by Google, it can match the IP addresses, device information, and various cookies it intercepts and link such information to an individual's specific identity.

63. Google then utilizes such information for its own purposes, such as targeted advertising.

64. Worse yet, Google informed website operators, like Robinhood, who use the Google Trackers, not to share any sensitive personal information with Google. Google stated: "Google prohibits customers from sending Personally Identifiable Information to Google Analytics.[6]" Google acknowledges that under certain circumstances, "use of cookies and app IDs falls under the privacy laws" and transmitting such data is prohibited.[7]

65. The problem that Google seeks to prevent is personal information from being redisclosed with advertisers. Any personal information that a website includes within the URL being sent to Google—in this case the consumer's stock ticker symbols, security prices, and even account

---

[6] https://support.google.com/analytics/answer/6004245#info_for_sites&zippy=%2Cgoogle-analytics-under-privacy-laws-in-the-united-states

[7] *Id.*

numbers—is also shared with advertisers within an ad request. In an example given by Google, it cautions against using Google Trackers on website where the URL contains any personal information "because those URLs would be passed to Google in any ad request."[8]

66. Ultimately, Google emphasizes the need to inform consumers about website's use of the Google Tracker and states "Google customers need to inform users about the information being stored and give them the opportunity to grant or deny their consent.[9]"

67. Robinhood failed to heed Google's warning and incorporated the Google Trackers thereby disclosing sensitive financial information to not only Google but also to advertisers.

**C. Robinhood Discloses Consumers' Financial Data**

68. To search and purchase stocks or securities on the Robinhood website, consumers must first create an account and log into the Robinhood stock trading platform. Consumers can search and purchase stocks and securities only after they log into their account on the Robinhood website.

69. Consumers begin by searching for securities on the Robinhood website. *See* <u>Figure 1.</u> As shown in the example below, the consumer searched for a Vanguard ETF called "VTI" using the search bar on the Robinhood website.




**(<u>Figure 1</u>)**

70. Once the consumer submits his or her search to Robinhood, the Google Trackers surreptitiously and without the consumers' knowledge and consent collect the search term. In this instance, the Google Trackers collect 1) the stock ticker symbol and 2) and a host of identifiers and cookies that allow Google to identify the consumer. *See* <u>Figures 2-3.</u>

[8] https://support.google.com/analytics/answer/7686480?sjid=12548597975863280224-NC
[9] https://support.google.com/analytics/answer/6004245?hl=en




(**<u>Figure 2,</u>** showing the search result page for the VTI ticker).




(**<u>Figure 3,</u>** showing an example of the Google Analytics tracker collecting stock search requests.)

71. Similarly, when the consumer navigates to a stock on his or her watchlist, the Google Trackers collect 1) the stock ticker symbol, 2) and indication that the consumer has the stock on his or her watchlist, 3) the stock price, 4) stock price, and 5) a host of cookies and identifiers that Google uses to identify the consumer. As shown in <u>Figure 4,</u> the consumer viewed the VTI stock from his or her watch list.




(**<u>Figure 4,</u>** showing an example of the Google Analytics tracker collecting stocks on a consumer's watchlist.)

72. To clarify, the "dl" parameter shown in *Figure 4* above denotes the document location or the URL that the consumer has requested. The "dt" parameter denotes the document title or the website page name. The "dl" parameter is a descriptive URL revealing the name of a stock and its status in the consumer's account. The "dt" parameter of the website title also reveals important information about the stock the consumer is viewing including the stock name and price.

73. Consumers can also purchase and hold securities in a portfolio using Robinhood. When a consumer views any security in his or her portfolio, the Google Trackers collect: 1) the stock ticker symbol, 2) the stock price, 3) indication that the consumer owns the security, 4) and identifiers and cookies. *See* <u>Figures 5-6.</u> The example below shows the ConocoPhilips stock ticker COP in the consumer's portfolio. The "lists_section_position" parameter shown in <u>Figure 6</u> indicates that a consumer holds a position in a given security and that they hold the security in their portfolio.




(**Figure 5,** showing the COP ticker in a consumer's Robinhood Portfolio.)



| | |
|---|---|
| dl | https://robinhood.com/stocks/COP?source=lists_section_position |
| dr | https://robinhood.com/?classic=1 |
| dt | COP - $132.00 \| Robinhood |
| _tu | CA |
| en | INP |
| ep.environ... | production |
| ep.page_... | web-platform-web-classic-placeholder-bundle-experiment:undefined |
| ep.event_... | Web Vitals |
| ep.event_l... | v3-1774990115443-2810400629913 |
| epn.value | 112 |
| _et | 3 |
| tfd | 19885 |

Request cookies 5

| Name | Value |
|---|---|
| __Secure-3PAPISID | LInSINsQNryJeamY/Ap7o4RevsudvnREIE |
| __Secure-3PSIDTS | sidts-CjIBBj1CYtELwitzg9yNI8iaeNeq5HaMEjZGcnXRUQ4mma... |
| NID | 530=V98LMUxgHNfj563mDkixDbLdDMGd0m4XjDuMPyTFWE... |
| __Secure-3PSID | g.a0008Qi2LnsRxiun319FXxK5B9RiPqYPwnnFx07p7soMTtBZ... |
| __Secure-3PSIDCC | AKEyXzUXGWmRONihVa17-mRBv1_i73eHn6EaKpfxIrleSwFGd... |

(**Figure 6,** showing the Google Analytics tracker collecting information about the COP stock in a consumer's portfolio.)

74. As shown in Figures 4 and 6, the Google Trackers collected various cookies that Google uses to correlate the consumer's activity to a Google account or, in the alternative, to create a profile on a non-Google user or a signed-out user. Relevant here, the "NID" and the "3PSIDTS" are Google advertising cookies used to measure and increase the effectiveness of Google's ads and

to personalize ads. Figures 4 and 6 show the Google Analytics tracker collecting cookies and identifiers used for marketing and advertising together with Plaintiffs' and the Class Members' communications with Robinhood revealing the stocks in their portfolios and watchlists.

75. Consumers can also purchase options using the Robinhood platform. An option is a contract to buy a security at a specific price in the future. The Google Trackers also collect information from the consumer indicating that they are browsing various option contracts for a specific stock. *See* Figure 7.

| | |
|---|---|
| dl | https://robinhood.com/options/chains/COP |
| dr | https://robinhood.com/stocks/COP?source=lists_section_position |
| sid | 1774558030 |
| sct | 1 |
| seg | 1 |
| dt | COP Options \| Robinhood |

(**Figure 7,** showing that a consumer is purchasing options for COP.)

76. Even worse, Robinhood discloses the consumer's Robinhood account number to Google. While taking various actions in the Robinhood account settings page, such as enabling margin investing—allowing the consumer to borrow money from the broker to purchase securities—or clicking on an advertisement banner promoting a Robinhood service such as the "Robinhood Legend" service, Robinhood discloses to Google the consumer's account number. *See* e.g., Figure 8.

| | |
|---|---|
| dr | https://robinhood.com/?applink=enable_margin_investing%3Fid%3Dbuying_power_hub%26account_number%3D73[redacted] |
| dt | Investing \| Robinhood |

(**Figure 8,** showing a Robinhood consumer's account number being disclosed to Google. Full account number redacted for privacy.)

77. Every intercepted communication by the Google Trackers contains identifiers such as cookies that allow Google to correlate a consumer's activity with their profile and for advertising purposes. The communications intercepted in Figures 7 and 8 all included cookies and identifiers such as including but not limited to the NID, 3PSID, and 3PSIDTS.

78. The information provided by consumers to Robinhood is nonpublic personal information. In other words, stock holdings by retail investors (like Plaintiff and the Class) are not public record and not available to members of the public or Google unless they have been disclosed by Defendant Robinhood. This information is sensitive and its disclosure is strictly regulated under both the GLBA and the CFIPA, requiring consumer consent prior to the disclosure to nonaffiliated parties.

79. Defendant Robinhood never informed consumers like Plaintiffs or the Class that it enabled third-party Google Trackers to collect their sensitive financial information, and certainly never obtained proper consent from Plaintiffs and the Class. In fact, Robinhood explicitly assured consumers that it will not share their personal information with nonaffiliates to market to consumers. *See* Figure 9. By sharing information about the consumers' financial transactions with Google, Robinhood allowed a nonaffiliated third party to use the consumers' private and sensitive financial information to let anyone advertise on the Google platform market to Robinhood customers.

| Reasons we can share your personal information | Does Robinhood share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes. | No. |
| **For our marketing purposes** – to offer our products and services to you | Yes. | No. (But see "Additional Privacy Choices for Customers" below) |
| **For joint marketing with other financial companies** | No. | We don't share. |
| **For our affiliates' everyday business purposes** – information about your transactions and experiences | Yes. | No. |
| **For our affiliates' everyday business purposes** – information about your creditworthiness | Yes. | Yes. |
| **For our affiliates to market to you** | Yes. | Yes. |
| **For nonaffiliates to market to you** | No.* | We don't share. (But see "Additional Privacy Choices for Customers" below) |

**(Figure 9)**

80. Google is not an affiliate of Robinhood, it is not a subsidiary of Robinhood, and it is not controlled by Robinhood. Google is an entirely independent third-party.

81. Despite this, Robinhood failed to obtain Plaintiffs' and Class Members' consent prior to disclosing their sensitive financial information to a non-affiliated company for Google's own

advertising purposes, let alone consent as required under the Gramm-Leach-Bliley Act and the California Financial Information Privacy Act.

82. Robinhood not only collected consumers' sensitive financial information for its own use, it also shared, and continues to share, this information with unauthorized third parties, such as advertisers using the Google advertising platform, who then use it for their own benefit.

**D. Plaintiffs' and the Class Members' Financial Information Has Financial Value**

83. The data disclosed to Google has economic value. Google and other third parties regularly use the data they acquire to create various advertising products and services. In the case of Google, it uses acquired data to create detailed profiles on consumers to more effectively serve advertisements to consumers. As an advertising platform that charges advertisers to display their ads, Google benefits from developing tools that leverage various data points to deliver more relevant advertisements.

84. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, internet companies earned $202 per American user from mining and selling data. That figure is only expected to increase in the future and estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

85. The value of financial data is well known and has been reported extensively. For example, research out of MIT Sloan "puts a price on the value of financial data" and reports that "companies often buy data to make smarter decisions." Researched recount that the "financial industry is awash in data that can provide value to businesses."[10]

86. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect

[10] https://mitsloan.mit.edu/ideas-made-to-matter/new-research-puts-a-price-value-financial-data

personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.”).

87. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

88. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a “Facebook Research” app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

**PLAINTIFF DUNN’s EXPERIENCE**

89. Plaintiff Jamillah Dunn has been a Robinhood user for at least the previous two years. She visited the Robinhood website to view securities she holds in her portfolio and to search for securities.

90. Plaintiff Dunn also has a Google account and was logged into her Google account on the same device that she used to visit the Robinhood website.

91. Additionally, Plaintiff viewed various offers on the Robinhood website including an offer for the Robinhood Legends service and visited the settings page.

92. Plaintiff Dunn visited the Robinhood website and logged into her account to access her portfolio, view securities she owned, search for securities, visit account settings, and interact with the Robinhood Legend offer. When Dunn communicated her searches, button clicks, page views, and selections with Robinhood, the Google Tracker intercepted her communications contemporaneously and collected the contents of those communications.

93. Unbeknownst to Plaintiff, as a result of Robinhood’s decision to install and configure the Tracking Tools on its Website, Google received and viewed the contents of Plaintiff’s communications, including the names and prices of the specific securities she searched for and holds in her portfolio. Google received this information alongside Plaintiff’s Robinhood account number and also received persistent identifiers allowing Google to specifically identify her and match her online activity to other data in its system.

94. Plaintiff believed her sensitive financial information would remain private and confidential, especially in light of Robinhood's explicit representations that it would not share her financial information with nonaffiliates. Plaintiff was not informed and had no reason to believe that unidentified third parties would intercept her communications—including sensitive financial information—with Robinhood.

95. Plaintiff never gave her consent to Robinhood or anyone else to collect or intercept any of her private information.

**PLAINTIFF SMITH's EXPERIENCE**

96. Plaintiff Smith has been a Robinhood user for at least the previous two years. He visited the Robinhood website to view securities he holds in his portfolio, download tax forms, and to search for securities.

97. Plaintiff Smith also has a Google account and was logged into his Google account on the same device that he used to visit the Robinhood website.

98. Additionally, Plaintiff viewed various offers on the Robinhood website including an offer for the Robinhood Legends service and visited the settings page.

99. Plaintiff Smith visited the Robinhood website and logged into his account to access his portfolio, view securities he owned, search for securities, visit account settings, and interact with the Robinhood Legend offer. When Smith communicated his searches, button clicks, page views, and selections with Robinhood, the Google Tracker intercepted his communications contemporaneously and collected the contents of those communications.

100. Unbeknownst to Plaintiff, as a result of Robinhood's decision to install and configure the Tracking Tools on its Website, Google received and viewed the contents of Plaintiff's communications, including the names and prices of the specific securities he searched for and holds in his portfolio. Google received this information alongside Plaintiff's Robinhood account number and also received persistent identifiers allowing Google to specifically identify him and match his online activity to other data in its system.

101. Plaintiff believed his sensitive financial information would remain private and confidential, especially in light of Robinhood's explicit representations that it would not share his

financial information with nonaffiliates. Plaintiff was not informed and had no reason to believe that unidentified third parties would intercept her communications—including sensitive financial information—with Robinhood. In fact, Plaintiff Smith explicitly reviewed the Robinhood GLBA disclosure shown in Figure 9 and understood it to mean that Robinhood would not disclose his financial information with outside companies, like Google, for the purposes of marketing to him.

102. Plaintiff never gave his consent to Robinhood or anyone else to collect or intercept any of his private information.

**PLAINTIFF DE LA LUZ's EXPERIENCE**

103. Plaintiff De La Luz has been a Robinhood user for at least the previous two years. He visited the Robinhood website to view securities he holds in his portfolio, to search for securities, to enable options trading, and to download tax forms.

104. Plaintiff De La Luz also has a Google account and was logged into his Google account on the same device that he used to visit the Robinhood website.

105. Plaintiff De La Luz visited the Robinhood website and logged into his account to access his portfolio, view securities he owned, search for securities, visit account settings, enable options trading, and download tax forms. When Plaintiff communicated his searches, button clicks, page views, and selections with Robinhood, his communications were intercepted by the Tracking Tools contemporaneously, while in transit.

106. Unbeknownst to Plaintiff, as a result of Robinhood's decision to install and configure the Tracking Tools on its Website, Google received and viewed the contents of Plaintiff's communications, including the names and prices of the specific securities he searched for and holds in his portfolio. Google received this information alongside Plaintiff's Robinhood account number and also received persistent identifiers allowing Google to specifically identify him and match his online activity to other data in its system.

107. Plaintiff believed his sensitive financial information would remain private and confidential, especially in light of Robinhood's explicit representations that it would not share his financial information with nonaffiliates. Plaintiff was not informed and had no reason to believe

that unidentified third parties would intercept his communications—including sensitive financial information—with Robinhood.

108. Plaintiff never gave his consent to Robinhood or anyone else to collect or intercept any of his private information.

**PLAINTIFF STARZINSKI's EXPERIENCE**

109. Plaintiff Alan Starzinski has been a Robinhood user for at least the previous two years. He visited the Robinhood platform using a Google Chrome browser to view securities he holds in his portfolio and to search for securities.

110. Plaintiff Starzinski also has a Google account and was logged into his Google account on the same device that he used to visit the Robinhood website.

111. Plaintiff Starzinski visited the Robinhood website and logged into his account to access his portfolio, view securities he owned, search for securities, visit account settings, enable options trading, and download tax forms. When Plaintiff communicated his searches, button clicks, page views, and selections with Robinhood, his communications were intercepted by the Tracking Tools contemporaneously, while in transit.

112. Additionally, Plaintiff viewed various offers on the Robinhood website including an offer for the Robinhood Legends service and visited the settings page.

113. Unbeknownst to Plaintiff, as a result of Robinhood's decision to install and configure the Tracking Tools on its Website, Google received and viewed the contents of Plaintiff's communications, including the names and prices of the specific securities he searched for and holds in his portfolio. Google received this information alongside Plaintiff's Robinhood account number and also received persistent identifiers allowing Google to specifically identify him and match his online activity to other data in its system.

114. Plaintiff believed his sensitive financial information would remain private and confidential, especially in light of Robinhood's explicit representations that it would not share his financial information with nonaffiliates. Plaintiff was not informed and had no reason to believe

that unidentified third parties would intercept his communications—including sensitive financial information—with Robinhood.

115. Plaintiff never gave his consent to Robinhood or anyone else to collect or intercept any of his private information.

## CLASS ACTION ALLEGATIONS

116. Class Definition: Plaintiffs bring this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and a Class of others similarly situated, defined as follows:

> **Class:** All individuals residing in the United States who have searched for, viewed, purchased a security, or viewed an options contract while logged into the Robinhood website on or before March 18, 2026.

117. In addition, Plaintiffs seek to represent a Subclass of persons defined as follows:

> **California Subclass:** All individuals residing in the state of California who have searched for, viewed, purchased a security, or viewed an options contract while logged into the Robinhood website on or before March 18, 2026.

118. Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

119. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

120. Numerosity: The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose private information may have been improperly disclosed to third parties, and the Class is identifiable within Defendant's records.

121. Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

(a) Whether Defendant engaged in the conduct alleged herein;

(b) Whether Defendant violated the ECPA;

(c) Whether Defendant violated the CIPA;

(d) Whether Defendant owed a duty to Plaintiffs and Class Members to safeguard and not disclose their non-public financial information to third parties, including Google, for marketing purposes without express consent;

(e) Whether Defendant breached its duty to Plaintiffs and Class Members to safeguard and not disclose their non-public financial information to third parties, including Google, for marketing purposes without express consent;

(f) Whether Defendant's conduct was negligent;

(g) Whether Defendant's conduct was negligent *per se*;

(h) Whether Defendant's alleged wrongful conduct constituted intrusion upon seclusion;

(i) Whether Defendant's alleged wrongful conduct constituted a breach of confidence;

(j) What damages Plaintiffs and Class Members suffered as a result of Defendant's misconduct;

(k) Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages as a result of Defendant's wrongful conduct;

(l) Whether Plaintiffs and Class Members are entitled to equitable relief as a result of Defendant's wrongful conduct, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

122. Typicality: Plaintiffs' claims are typical of those of other Class Members because all had their sensitive financial information compromised as a result of Defendant's incorporation of the Google Trackers.

123. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

124. Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

125. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

126. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the

costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

127. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

128. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

129. Unless a class-wide injunction is issued, Defendant may continue disclosing the financial information of Plaintiffs and the Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

130. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## CAUSES OF ACTION

### COUNT I
### Violation of the Electronic Communications Privacy Act ("ECPA")
### 18 U.S.C. § 2511 *et seq.*
### (On behalf of Plaintiffs, the Nationwide Class)

131. Plaintiffs reallege and reincorporate the foregoing allegations as if fully set forth herein.

132. The Electronic Communications Privacy Act ("ECPA") prohibits any person from intercepting or procuring any other person from intercepting electronic communication. 18 U.S.C. § 2511(1)(a). Furthermore, the ECPA prohibits any person from disclosing to any other person the content of an electronic communication. 18 U.S.C. § 2511(1)(c).

133. Communications between Plaintiffs and the Class and Defendant's financial services platform are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

134. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

135. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

136. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a) Plaintiffs' and Class Members' browsers;

(b) Plaintiffs' and Class Members' computing devices and mobile devices;

(c) Robinhood's web-servers; and

(d) The Trackers deployed by Robinhood to effectuate the sending and acquisition of communications.

137. Robinhood did not merely permit or procure the interception of Plaintiffs' and Class Member's communications. Robinhood itself intercepted those communications. Robinhood selected, customized, configured, and deployed the Trackers; it embedded Google's code on its webpages; and it determined what data the Trackers would capture and to which third parties that data would be routed. By these affirmative acts, Robinhood played an active role in the interception of Plaintiffs' and Class Members' communications, such that the interception was carried out by Robinhood and not solely by Google. Robinhood is therefore directly liable as an intercepting party under 18 U.S.C. § 2511(1)(a).

138. The Trackers operated as Robinhood's own instruments. They ran as code embedded in and served from Robinhood's webpages; they executed automatically whenever a consumer communicated with those pages; and they functioned according to configurations that Robinhood selected as the holder of the Google accounts associated with the tools and tags on its website. Through the Trackers, Defendant acquired the contents of Plaintiffs' and Class Members' communications as those communications were made and simultaneously caused duplicate transmissions of those contents to be routed to Google. Defendant thereby intercepted, and endeavored to intercept, Plaintiffs and Class Members' electronic communications. Its liability under the ECPA is direct; Plaintiff does not proceed against Defendant on this Count on a theory of aiding, abetting, or other secondary liability.

139. The contents of the intercepted communications were also returned to Defendant. Google's business and advertising platforms are designed to—and, on information and belief, did—report back to their advertiser customers, including Defendant, event-level and audience-level information derived from the intercepted communications, including conversion tracking, audience segments, and campaign analytics. Defendant used the contents of the intercepted communications, directly and through those advertising tools, to track conversions, to build remarketing audiences of account holders, to measure and optimize its advertising, and to target consumers—including Plaintiffs—with advertisements, knowing or having reason to know that the information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(1), in violation of 18 U.S.C. § 2511(1)(d). Defendant's intentional disclosure and redirection of those contents to Google and its advertising systems likewise violated 18 U.S.C. § 2511(1)(c).

140. When Plaintiffs and Class Members interacted with Defendant's website, Defendant, through the Google Trackers embedded and operating on its website, contemporaneously and intentionally disclosed, used, and redirected, and endeavored to disclose, use, and redirect, the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Google without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c)-(d).

141. The communications intercepted by Defendant and Google include, but are not limited to, the contents of communications to and from Plaintiffs and Class Members regarding their accounts and portfolios. As such, Defendant violated 18 U.S.C. § 2511(1)(a).

142. Furthermore, by intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Google while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c)-(d).

143. Defendant intentionally used the wire or electronic communications to increase its profit margins, and it specifically used the Trackers to track and utilize Plaintiffs' and Class Members' financial information for its own financial gain.

144. Google used the wire or electronic communications for its own purposes: to increase their profit margins and to serve consumers advertisements based on the behavioral information they collected.

145. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

146. Plaintiffs and Class Members did not authorize Defendant to acquire the content(s) of their communications for any purpose whatsoever.

147. Any purported consent Defendant received from Plaintiffs and Class Members was not valid.

148. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing criminal or tortious acts independent of, and beyond, the act of interception itself, as well as in contradiction to the representations that it will not share personal information. At the time of the interception, Defendant intended not merely to acquire the communications, but to use and disclose those communications thereafter—by incorporating their contents into persistent consumer profiles, monetizing them, and deploying them to target advertising—in a manner that itself constituted a further invasion of privacy and a violation of the financial privacy obligations required by the laws of the United States and California. The independent criminal and tortious acts include, inter alia,

violations of the confidentiality obligations imposed by the GLBA, 15 U.S.C. § 6802, and the CFIPA, Cal. Fin. Code § 4052.5, the breach of Defendant's promises not to share consumers' personal information, and the common law intrusion upon Plaintiff's and Class Members' seclusion alleged herein. The commission of those independent criminal and tortious acts was the primary motivation for, or at a minimum a determining factor in, Defendant's interceptions, and that purpose existed at the time of each interception.

149. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

150. Defendant is a "party to the communication" with respect to Plaintiffs' and Class Members' communications, but its simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' communications does not qualify for the party exemption.

151. More specifically, Defendant's acquisition of Plaintiffs' and Class Members' communications, which were used and disclosed to unauthorized third parties, was done for the purpose of committing criminal and tortious acts in violation of the laws of the United States and California.

152. As such, Defendants cannot viably claim any exception to ECPA liability.

153. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's violations of the ECPA.

154. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Pen. Code §§ 631 and 632**
**(<u>On behalf of Plaintiffs and the California Subclass</u>)**

155. Plaintiffs reallege and reincorporate the foregoing allegations as if fully set forth herein.

156. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose.

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

157. California Penal Code § 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

158. Under CIPA, Defendant must show it had the consent of all parties to a communication before allowing a third party to intercept those communications.

159. At all relevant times, Defendant aided, employed, agreed with, and conspired with third parties, including Google, to track and intercept Plaintiffs' and Class Members' internet communications with Defendant while those communications were in transit or being sent from or received within California. The contents of these communications were read and their meaning learned by a third party during the communication, in real-time, without the knowledge, authorization, or consent of Plaintiffs and Class Members.

160. Defendant intentionally inserted an electronic listening device onto Plaintiffs' and Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with Defendant to Google—each of whom constitute a "person" within the meaning of the statute.

161. Defendant willingly facilitated the interception and collection of Plaintiffs' and Class Members' sensitive financial information by embedding the Google Trackers on its website.

162. The Google Trackers constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

163. Defendant failed to disclose to Plaintiffs and the Class Members that it was using the Google Trackers to specifically track and automatically and simultaneously transmit their communications with Defendant to Google.

164. Defendant violated CIPA by aiding and permitting third parties to intercept and receive its consumers' online communications in real time as they were made. Importantly, the Google Trackers would not have intercepted or received the contents of these communications but for Defendant's actions, including its decision to install the trackers on its website.

165. By allowing third parties to intercept Plaintiffs' and Class Members' sensitive financial information, Defendant violated Plaintiffs' and Class Members' statutorily protected right to privacy.

166. The intercepted communications from Plaintiffs' and the Class Members' devices were used for Google's benefit. That is, Google used the communications to improve its services and the effectiveness of their advertisements.

167. Plaintiffs' and the Class Members' sensitive financial information is considered a "confidential communication" under Cal. Pen. Code § 632(c) because it arose in circumstances "as may reasonably indicate that any party to the communication desires it to be confined to the parties…"

168. As a result of the above violations, and pursuant to § 637.2, Defendant is liable to Plaintiffs and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

169. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT III**
**Negligence/Gross Negligence/Negligence *Per Se***
**(<u>On behalf of Plaintiffs, the Nationwide Class</u>)**

170. Plaintiffs reallege and reincorporate the foregoing allegations as if fully set forth herein.

171. Plaintiffs bring this claim individually and on behalf of the Class Members.

172. Plaintiffs and Class Members entrusted Defendant with confidential, non-public financial information on the premise and with the understanding that Defendant would reasonably safeguard their non-public financial information, use their non-public financial information for business and permissible purposes only, and not disclose their non-public financial information to third parties for marketing purposes.

173. Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, using, and safeguarding the privacy of their non-public financial information. Indeed, Defendant promised consumers that it will not disclose their private information to non-affiliates for marketing purposes.

174. Defendant also has independent duties under federal and state laws that required it to reasonably safeguard Plaintiffs and Class Members' non-public financial information and promptly notify them and obtain their express consent before disclosing such information to third parties for marketing purposes such as the GLBA and the CFIPA.

175. Specifically, pursuant to the Gramm-Leach-Bliley Act, 15 U.S.C.§ 6801(a), Defendant had "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information.".

176. Plaintiffs and Class Members are within the class of persons the GLBA intended to protect.

177. The type of harm that resulted from Defendant's unauthorized disclosures as alleged herein are the type of harm the GLBA was intended to guard against.

178. Likewise, pursuant to the California Financial Information Privacy Act, Defendant owed a duty to Plaintiffs and the California Subclass to not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior

consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

179. Plaintiffs and Members of the California Subclass are within the class of persons the CFIPA intended to protect.

180. The type of harm that resulted from Defendant's unauthorized disclosures as alleged herein are the type of harm the CFIPA was intended to guard against.

181. Defendant was in an exclusive position to protect Plaintiffs' and Class Members' non-public financial information from third-party access. Plaintiffs' and Class Members relied on Defendant to safeguard and keep confidential the non-public financial information shared by Plaintiffs and Class Members with Defendant.

182. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by intentionally disclosing Plaintiffs' and Class Members' non-public financial information within its possession to third-parties, including Google, for marketing purposes.

183. Defendant, by its actions and/or omissions, breached its duty of care by acting with reckless disregard for the confidentiality of Plaintiffs' and Class Members' non-public financial information within its possession.

184. Defendant knew or should have known that its data sharing practices with respect to Plaintiffs' and Class Members' non-public financial information were in breach of its duties of care to Plaintiffs and Class Members.

185. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

(m) Failing to implement adequate security systems, protocols, and practices sufficient to protect Plaintiffs' and Class Members non-public financial information;

(n) Failure to comply with the GLBA;

(o) Failure to comply with the CFIPA.

186. Defendant's violations of the GLBA, 15 U.S.C. § 6801(a) and § 6802(b) constitute negligence per se.

187. Defendant's violations of the CFIPA constitute negligence per se.

188. Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' non-public financial information to be shared with third parties, including Google, for marketing purposes, as alleged herein.

189. It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' non-public financial information would result in the unauthorized release, disclosure, dissemination, and use of Plaintiffs' and Class Members non-public financial information to unauthorized individuals and for unauthorized purposes.

190. As a direct and proximate result of Defendant's breach of its duties of care, Plaintiffs and Class Members suffered and will continue to suffer significant injuries, including, but not limited to: (1) loss of privacy; (2) diminution in the value of their non-public financial information due to the loss of confidentiality and privacy; (3) lost value of their non-public financial information; (4) time and expense reasonably incurred investigating and mitigating the disclosure; and (5) emotional and mental distress and anguish resulting from the access and disclosure of their non-public financial information.

191. Plaintiffs and the Class seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees.

192. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, among other things, end the unlawful practice of disclosing their non-public financial information to third parties, including Google, for marketing and other unauthorized purposes without their express consent.

**COUNT IV**
**Violation of California's Consumer Privacy Act, Cal. Civ. Code. § 1798.150**
**(On behalf of Plaintiffs and the California Subclass)**

193. Plaintiffs reallege and reincorporate the foregoing allegations as if fully set forth herein.

194. Plaintiffs bring this claim individually and on behalf of the California Subclass.

195. Defendant violated California Civil Code Section 1798.150, as well as Sections 1798.100 and 1798.115(d) (The "CCPA") by collecting sensitive personal financial information from Plaintiffs and members of the California Subclass and disclosing their non-public financial information to third-parties including Google for marketing purposes without having clearly and conspicuously disclosed to Plaintiffs and members of the California Subclass the categories and specific pieces of personal information Robinhood disclosed to third parties, including Google, and how that information would be shared and used by third parties like Google. Defendant further violated California Civil Code Section 1798.150 by failing to implement and maintain reasonable procedures and practices appropriate to the nature of the information, resulting in unauthorized access to and disclosure of Plaintiffs' and California Subclass members' nonencrypted, nonredacted personal information to Google, a third party. Plaintiffs and members of the California Subclass bring this claim for relief under Section 1798.150.

196. For purposes of Section 1798.150, Plaintiffs allege that their nonencrypted and nonredacted personal information was subject to unauthorized access and disclosure as a result of Robinhood's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, particularly in the absence of clear and conspicuous disclosure to Plaintiffs and members of the California Subclass of the categories and specific pieces of personal information Robinhood disclosed to third parties, including Google, and how that information would be shared and used by third parties like Google. Robinhood deployed tracking code on authenticated financial-account pages without controls sufficient to prevent account numbers and other sensitive values from being inserted into URLs, event parameters, or payloads transmitted to Google.

197. Upon information and belief, the transmitted account and identifier data, considered together, included an account number that permitted or facilitated access to Plaintiffs' financial account and identify them personally.

198. Robinhood's disclosure was "unauthorized" within Section 1798.150 because Google's receipt of the protected information exceeded the authorization communicated to Plaintiffs

and the California Subclass and resulted from Robinhood's failure to prevent sensitive account credentials from being included in third-party tracking requests.

199. Defendant Robinhood is a "business" under the meaning of California Civil Code § 1798.140(d) because Defendant Robinhood is a "corporation[s], association[s], or other legal entit[ies] that [are] organized or operated for the profit or financial benefit of [their] shareholders or other owners" that "collect consumers' Private Information" and are active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year."

200. Plaintiffs and the California Subclass seek injunctive or other equitable relief to ensure Defendant Robinhood hereinafter adequately safeguards their non-public financial information.

201. As a direct and proximate result, California Plaintiffs' and the California Subclass' nonpublic personal information was subject to unauthorized access and disclosure. Such relief is particularly important because Defendant continues to hold non-public financial information, including Plaintiffs' and the California Subclass's non-public financial information. Plaintiffs and the California Subclass have an interest in ensuring that their non-public financial information is reasonably protected, and Defendant has demonstrated a pattern of intentionally disclosing their non-public financial information without adequate disclosure and consent.

202. On June 1, 2026, Plaintiff Dunn sent Robinhood written notice identifying violations of Civil Code sections 1798.100, 1798.115, and 1798.150 and demanding an actual cure within 30 days pursuant to section 1798.150(b). Robinhood received the notice no later than June 9, 2026. More than 30 days elapsed. In its July 9, 2026 written response, Robinhood denied that any violation existed, stated that there was nothing to cure, and did not provide an express written statement that the violations had been cured and that no further violations would occur. Robinhood did not recover or delete the disclosed information, obtain confirmation that Google and downstream recipients had deleted it, or otherwise eliminate the continuing consequences of the disclosure. Plaintiff Dunn has therefore completed the statutory notice process and now seeks statutory damages on an individual and class-wide basis.

203. Plaintiffs now seek actual damages and injunctive relief as a result of Defendant's violations described herein. Plaintiffs seek the greater of actual damages or statutory damages of not less than $100 and not greater than $750 per California consumer per incident, subject to any statutory adjustment, together with injunctive or declaratory relief and all other relief the Court deems proper under Civil Code section 1798.150(a).

204. As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable notice and consent procedures and practices appropriate to the nature of the information so as to protect the non-public financial information under the CCPA.

205. A judicial determination on this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

**COUNT V**
**Intrusion Upon Seclusion**
**(On behalf of Plaintiffs and the Nationwide Class)**

206. Plaintiffs reallege and reincorporate the foregoing allegations as if fully set forth herein.

207. Plaintiffs bring this claim individually and on behalf of the Class Members.

208. Defendant intentionally and without the Plaintiffs' and the Class Members' authorization, intruded into their seclusion. Specifically, Defendant intentionally embedded trackers on its website that collected sensitive financial information from the Plaintiffs' and the Class Members.

209. Defendant knew that by installing the Google Trackers on its website, it would allow an unaffiliated third party to intrude or pry into Plaintiffs' and Class Members' sensitive financial information.

210. Plaintiffs and the Class reasonably expected their account-specific financial information, their securities holdings, portfolio and watchlist activity, and account numbers, to remain private and not be disseminated to third parties such as Google for advertising and marketing purposes.

211. Indeed, a reasonable person would find the disclosure of their sensitive financial information including securities holdings, portfolio and watchlist relationships, and account-number information without their knowledge or consent highly offensive and objectionable.

212. The alleged intrusion was not routine observation of an anonymous consumer visiting a public webpage. It occurred within an authenticated brokerage account and disclosed the customer's private relationship to particular investments together with persistent identifiers. Repeated collection over time could reveal trading interests, investment strategy, risk tolerance, wealth indicators, and changes in financial position.

213. The intrusion was highly offensive because Robinhood was a regulated financial institution entrusted with confidential account information; the tracking occurred invisibly on logged-in pages; the information was capable of being linked to Plaintiffs; the disclosure contradicted specific financial-privacy assurances; and Google had an independent commercial interest in profiling and advertising.

214. Plaintiffs and the Class Members suffered harm in the form of mental pain and anguish worrying how an unauthorized disclosure of their financial information to unknown third parties may affect their life. Plaintiffs and the Class worry how this disclosure (1) may be used to market to them, (2) whether nefarious actors may use their information to perpetuate identity theft and fraud, (3) who and for what purpose may have obtained their personal financial information, and (4) how Plaintiffs and the Class may secure their sensitive financial information in the future, among other.

**COUNT VI**
**Breach of Confidence**
**(<u>On behalf of Plaintiff and the Nationwide Class</u>)**

215. Plaintiffs reallege and reincorporate the foregoing allegations as if fully set forth herein.

216. Plaintiffs bring this claim individually and on behalf of the Class Members.

217. Plaintiffs and the Class conveyed confidential information to Defendant. The information provided contained sensitive financial information.

218. Not only is there an expectation that financial information is confidential; both Federal and state law require financial institutions to keep information furnished to a financial institution to be confidential. *See e.g,* 15 U.S.C.§ 6801(a).

219. Moreover, Defendant explicitly assured consumers that it would not share their personal information with nonaffiliates to market to consumers. *See* Figure 9, above.

220. Despite these assurances, Defendant, being a financial institution, in fact knew that the information it solicited from Plaintiffs and the Class was being conveyed in confidence. As explained above, Defendant allowed trackers to obtain sensitive financial information from Plaintiffs' and the Class's authenticated brokerage-account activity, securities holdings, account activity, portfolio and watchlist relationships, and account information, in breach of its duty of confidence to Plaintiffs and Class Members.

The duty of confidence arose from the confidential relationship and circumstances under which customers entrusted account-specific financial information to a regulated brokerage, independently of and, if necessary, in the alternative to any contractual duty. Robinhood knew customers supplied and generated this information for the limited purpose of receiving brokerage services, not for disclosure to Google for independent commercial use.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Dunn, Smith, De La Luz, and Starzinski, individually and on behalf of the Class, seek the following relief:

a. An order certifying the Class as defined above, appointing Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as Class Counsel;

b. An order declaring that Defendant's actions, as set out above, violate the ECPA, CIPA, CCPA, were negligent, and constituted intrusion upon seclusion and breach of confidence;

c. An injunction requiring Defendant to cease all unlawful activities;

d. An award of actual and statutory damages;

e. An award of attorneys' fees and costs; and

f. Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: September 14, 2026

Respectfully Submitted,

By: */s/ Will J. Edelman*______________

Will J. Edelman (SBN 285177)
Gary Klinger
**MILBERG PLLC**
227 W. Monroe St
Suite 2100
Chicago, IL 60606
Tel: 866-252-0878
Email: gklinger@milberg.com
Email: wedelman@milberg.com

Kara L. Kapp (SBN 300896)
**MILBERG PLLC**
5335 Wisconsin Ave NW
Suite 440
Washington, D.C. 20015
Tel: 516-620-4219
Email: kkapp@milberg.com

Albert Plawinski*
**PLAWINSKI, PLLC**
2101 Pearl St.
Boulder, Colorado 80302
Tel: (303) 720-7095
Email: albert@plawinski.law

**Pro Hac Vice Admission to Be Sought*

*Counsel for Plaintiffs and the proposed Class*